# THE STATE v. PARKER, Appellant.

### Division Two, February 24, 1903.

1.  **Dying Declaration:** ADMISSIBILITY. Where the surgeons had advised deceased that he could not live, and, regarding his death as inevitable, summoned the scrivener who took down the declaration, and it contained a statement that deceased makes it "realizing and believing that I am mortally wounded and in the immediate presence of death and that I have no hope of recovery," all of the declaration that is competent is properly admitted in evidence although the wife of deceased may deny that deceased thought he was going to die.

2.  ———: COMPETENCY. Dying declarations are admissible as to those facts and circumstances constituting the *res gestae* of the homicide, but as to all other matters occurring anterior to the killing and not immediately connected with it, they are incompetent.

3.  ———: ANTERIOR THREATS: HARMLESS ERROR. In the dying declaration deceased said: "I never made any threats against him in my life." *Held*, that all these words, and not merely those "in my life," should have been stricken out, as necessarily referring to matters anterior to the fatal encounter. And as they tended directly to disprove the evidence of defendant's witnesses that deceased had made threats of violence towards him which had been communicated, they can not be held to be harmless, but their admission is reversible error.

4.  ———: VERBAL ACTS. Statements in the dying declaration that as defendant entered the room where the shooting immediately occurred, "I saw he was mad," "that was the first I knew he was mad," "I spoke first and said, 'What is the matter with you, Jim; what are you mad about?'" are competent evidence as they were declarations of facts which occurred then and there, the colloquy between deceased and defendant being a part of the *res gestae*.

5.  ———: WEIGHT: INSTRUCTION. This instruction was correct: "The statement read to you as the dying declaration of deceased should be received by you as such declaration, but because it is a dying declaration you are not necessarily bound to believe it, but you will give it that weight which you think it ought to have when considered in connection with all the other facts and circumstances in evidence."

State v. Parker.

6. **Threats:** DEFENDANT'S INSTRUCTION. It is not error to refuse defendant's instruction on the subject of threats if the court has already instructed the jury on the purpose for which threats may be admitted in evidence.

7. **Self-Defense:** DEFENDANT'S INSTRUCTION. Where the court fully instructed on the subject of self-defense it is not error to refuse another instruction on the same subject.

8. **Remarks of Prosecuting Attorney:** ABSENCE OF WITNESS. It is legitimate argument for the prosecuting attorney to call attention to the fact that a son of defendant who was an eyewitness of the homicide, who had testified in defendant's behalf on a former trial, and who had not been subpoenaed, was absent and did not testify, since the presumption is that if the testimony of that eyewitness would have corroborated defendant's testimony he would have called him.

9. **Feloniously:** USE IN INSTRUCTION. It is necessary that an instruction defining murder charge that the homicide was feloniously committed, but it is not necessary that the instruction contain the word "feloniously." It may by the use of other words give the jury the constituent elements of the crime.

10. **Threats:** WEAPONS IN HAND. It is immaterial that deceased when he made threats against defendant at a time when defendant was not present, had a knife in his hands.

11. **Reputation for Peace:** FORMER DIFFICULTIES. It is proper in the cross-examination of a witness who has testified to the general reputation of defendant as a peaceable, law-abiding man, to inquire if he had ever heard that defendant four years previously had tried to kill his sons, and that he had on another occasion when operating a certain saloon, got into a shooting scrape, but such inquiry should not descend to the particulars of stating the number of shots fired by him on such occasions.

## Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford,* Judge.

REVERSED.

*Jno. M. Dougherty, Ralph S. Latshaw* and *Jos. S. Brooks* for appellant.

(1) The court erred in refusing to strike out from the dying declaration, "did not make a threat and never had made a threat against him. I did not think he was going to shoot me, as I had never given him any cause to

shoot me. I had never had a quarrel with him. I never made any threats against him in my life. I had not touched a drop of liquor for over a month. . . . I know of no reason whatever why he shot me, except as above set out." State v. Jefferson, 77 Mo. 136; State v. Draper, 65 Mo. 335; State v. VanSant, 80 Mo. 67; State v. Chambers, 87 Mo. 406; State v. Parker, 96 Mo. 382; State v. Elkins, 101 Mo. 344.     (2)    Dying declarations to be admissible must be restricted to identification of the accused, to the act of killing, and the circumstances immediately attending it, and are inadmissible as to all other matters.    State v. Draper, 65 Mo. 335; State v. VanSant, 80 Mo. 67.    (3)    The court erred in giving the instruction as to the weight the jury should give to the dying declaration.    State v. McCannon, 51 Mo. 170; State v. VanSant, supra.    (4)    The court erred in refusing to give the instruction asked by appellant as to threats made by deceased against appellant before the killing.    State v. Harrod, 102 Mo. 590; State v. Grant, 79 Mo. 113; State v. Evans, 65 Mo. 574.    (5) The court erred in refusing to give the instruction asked by defendant upon the law of self-defense.    The instruction given by the court does not fully and correctly declare the law as to self-defense.    State v. Grugin, 147 Mo. 39.    (6)    The court erred in permitting the prosecuting attorney to say to the jury in his closing argument:  "Where is Jimmy Parker, the son of this defendant, who was an eyewitness to this transaction, and testified at the other trial of this case; where is Jimmy Parker?"    The witness had not been subpoenaed by the defense nor had been offered by the defense.    State v. Weaver, 165 Mo. 1; State v. Fairlamb, 121 Mo. 150; State v. Moxley, 102 Mo. 392.    (7)    The court erred in giving instruction 3 on the part of the State, and did not therein correctly define murder in the second degree. Murder in the second degree is not defined by our statute and the crime in Missouri is the same as at common law.    At common law it was necessary to use the word "feloniously" in charging or defining murder in the

second degree. The instruction tells the jury that if "the defendant willfully, premeditatedly and of his malice aforethought did," etc., and omits the word "feloniously." ` (8) The court erred in refusing to permit appellant's counsel to ask witness Mrs. I. G. Miller this question: "You may state what, if anything, he had in his hand?" The deceased at the time was standing in front of appellant's house, had threatened to shoot appellant, who was at the time inside the house. Appellant offered the testimony on account of the fact that deceased at the time of making the threat was standing in front of appellant's house and evidently intending to carry out the threat.

*Edward C. Crow,* Attorney-General, and *Jerry M. Jeffries* for the State.

(1) The testimony shows that the dying declaration admitted in evidence was the declaration of one who was conscious of impending death, with no hope whatever that he would recover. This was all that was necessary to prove to make the declaration competent evidence. State v. Kilgore, 70 Mo. 546; State v. Wensell, 98 Mo. 137. Where the condition of declarant (as it was in this case) was of itself such that deceased must have known that he could not survive the injury, it was not necessary that he should have used any expression of his belief that he could not or would not recover. State v. Wensell, 98 Mo. 137; State v. Turlington, 102 Mo. 642. (2) Defendant had no right to prove that at the time deceased made a threat against him many days previous to the homicide deceased had a knife in his hand. Defendant was not present at the time or place when witness said deceased threatened defendant. Such evidence was certainly immaterial and to say the most for defendant its exclusion did not in any manner prejudice his interests. (3) The objection made by defendant to certain questions asked by the State's attorney, such as if witnesses did not know of defendant's being arrested and fined, was sustained. The objection,

State v. Parker.

however, stated no grounds for the objection either to this question or to the previous question aimed at by it. As an objection to the previous question it came too late, and the action of the court was not error, for defendant should have stated a reason for his objection. State v. Young, 153 Mo. 445; State v. Rapp, 142 Mo. 443. (4) During the argument of the case Mr. Hadley, one of the State's attorneys, said to the jury, "Where is Jimmy Parker, the son of this defendant, who was an eyewitness to this transaction and testified at the other trial of this case; where is Jimmy Parker?" To which defendant objected as an allusion to the failure of defendant to bring the witness to the trial. Such remark could not prejudice defendant, yet it was proper. Where the State alluded to witnesses defense had subpoenaed, but did not use them, held, no error. State v. Emery, 79 Mo. 461; State v. Hopper, 71 Mo. 425; State v. Kring, 1 Mo. App. 438. (5) Where the law laid down in a proposed instruction is embodied in one already given by the court it is not error to refuse the proffered declaration of law. State v. Berkley, 109 Mo. 665; State v. Pratt, 98 Mo. 482; State v. Ferguson, 29 Mo. 416. Improper instructions on a grade of crime higher than that of which defendant was convicted is no ground for a new trial. It is not necessary to notice instructions for murder in the first degree. Defendant was convicted of murder in the second degree. State v. Wisdom, 84 Mo. 177; State v. Kelly, 85 Mo. 143.

GANTT, P. J.—From a conviction of murder in the second degree in the criminal court of Jackson county, at the September term, 1901, of said court, the defendant prosecutes this appeal.

The indictment was preferred on the 27th day of October, 1900, and the defendant was duly arraigned and pleaded not guilty. He was tried at the April term, 1901, and convicted of murder in the second degree, but a new trial was granted and the case was again tried at the September term of that year, and again resulted in a conviction of murder in the second degree.

It is not deemed necessary to reproduce the indictment, as it is in all respects sufficient, and such as has met the approval of this court on numerous occasions. The facts developed on the trial were substantially the following:

The defendant was the father-in-law of the deceased, Edward R. Carl, and on the day of the homicide, the 9th day of June, 1900, they were and had been for some months both residing in the same house, No. 1240 Jefferson street, in Kansas City, Jackson county, Missouri. The defendant was the proprietor of the house and the deceased and his wife were staying with him, the deceased having no regular employment at the time, but was assisting in a general way about the house. The defendant was keeping a boarding house at the time. The defendant's evidence and the dying declaration of the deceased was the only testimony as to what occurred at the time of the homicide.

The defendant testified that on the morning of the 9th day of June, 1900, he arose somewhere between 7 and 7:30 o'clock, and went to a closet in the back yard of the premises and returning went up stairs to wash, in a room in which deceased was dressing himself. He testified that he went to a washstand, picked up a washbowl and emptied the water into a receiver and started to or did pick up a pitcher of water to put some water in the bowl to wash. Just then Carl, the deceased, said "I am going away to-day," to which defendant replied, "I am very glad of it, Sallie [the wife of deceased] will have some satisfaction." Deceased said, "You old s—n of a b—h, I will fix you now." "I turned and as I turned he kicked at me; I went on, and when I got down on the steps four or five steps at the turn of the stairs, the banisters came round, and I turned my head around, Mr. Carl [the deceased] was coming right on and I turned my head around. Carl was coming right on and said, 'You old s—n of a b—h, I will cut your guts out.' He had a razor in his hand. I reached back in my pocket this way [indicating] and shot. I didn't know whether I hit the man or not. I didn't take any

aim. When I got down to the bottom of the steps I met my son and daughter. When I went out to the closet I had on my pants, shoes and stockings and my undershirt. I had my pistol in my right hip pocket. I had my pistol in my pocket when I went up stairs. When I entered the front room up stairs, the southeast room, Carl was wiping his face with a towel, at the washstand, which stood a little past the center of the room on the east side. When Carl said 'I'll fix you now,' I turned and as I turned he kicked at me. I walked straight out and he reached over and picked up his razor with his left hand. I was two or three feet from him when he reached for the razor and probably four or five feet from him when I got to the door of the room, east of me. We were both walking. I went out and turned to the right to go down the steps. I got down four or five steps when I shot him. He was still at the top of the steps. He didn't make a swipe at me, but had the razor in his hands. When I shot, my back was to him and in a northwestern direction from him, four or five steps.''

Defendant also testified that Mrs. Steele some two or three weeks prior to the homicide told him deceased had said he intended to kill him before he left his house, and that Mr. and Mrs. Bradley had also communicated to him threats made by deceased against him.

Defendant testified he met his daughter and son, Jim Parker, at the foot of the stairs immediately after he shot. That James had testified on the former trial that he was an eyewitness to the shooting.

The dying declaration of the deceased described the homicide as follows:

''Kansas City, June 9, 1900.

''I, Edward Carl, realizing and believing that I am mortally wounded and in the immediate presence of death and that I have no hopes of recovery, make this statement of the circumstances of my shooting. I was upstairs in the room of Robinson and Wright, second floor, 1240 Jefferson street, this morning when Mr. Parker came up. I had been in the room about ten or

fifteen minutes, long enough to shave and had shaven, and was standing close to the mirror wiping my face when Mr. Parker came upstairs. The first thing he said was, 'Are you going to leave here.' I said, 'Right away, I am fixing to go now.' *I saw he was mad.* That was the first I knew he was mad. He said. 'Go right at once or I will see that you do.' I said, 'I am going right now.' He then walked down stairs. I had finished wiping my face and had started into another room where the wardrobe was to get another pair of trousers to put on. I had just gotten between the doors of the two rooms and right by the head of the stairs when he came up the stairs. I saw him first when he was about three or four steps from the top. I spoke first and said, ''What in the world is the matter with you, Jim, what are you mad about?' He said, 'I will kill you,' and I think he said, 'You son-of-a-bitch' in addition, something like son-of-a-bitch anyway. He shot just after he uttered this threat. I had turned and faced him when I saw him coming. I had on neither coat nor vest and my hands were hanging naturally by my side. I had no weapon on me, and was not expecting trouble of any kind. When he shot I rushed into the room where the wardrobe was and slammed the door to and held it. He shot but once. I did not say an un-- kind word to him. Did not make a threat [and never had made a threat against him.] [I did not think he was going to shoot me, as I had never given him any cause to shoot me.] [I had never had a quarrel with him.] [I had been out of regular work about a year and part of the time I was not able to pay board. He had not said anything to me, but yesterday morning he had a quarrel with his wife, and said something about me lying around there. The last time I saw Mr. Parker was last night about 8:30. I was sitting out in the front of the house; he said nothing. We had been on friendly terms and I did not know that he had any enmity toward me until yesterday morning when my wife told me Mr. Parker was mad.] I never made any threats against him in my life. I had not touched a drop of liquor for

over a month.   When he came up stairs the first time he did not have his revolver, but when he came up the second time he had it in his hand.   I know of no reason whatever why he shot me except as above set out.''

All that portion of the declaration within brackets was excluded.   Dr. J. M. Langsdale, who was assistant coroner under Dr. Lester at the time of the homicide, made a post-mortem examination of the body of deceased, the day after he was shot.·   He found a gun shot wound on the left front of the abdomen slightly to the left of the median line about four and one-half inches above the navel.   This wound penetrated the abdomen, passed downward, backward and to the left.·   In its passage downward it cut one of the small guts and passed through the body of the left kidney near the middle, and passed out through the rear wall.   He turned the body over and found an incision on the back which he presumed was made by some one in removing the bullet.   The bullet was not deflected in its course which was downward and backward.   This wound was a mortal one.   The exit of the bullet was some two inches below the point of the entrance.   He noticed no other injuries to the body of deceased.

Frank Fredericks, surgical nurse at the hospital, corroborated Dr. Langsdale as to the character of the wound and course of the bullet.   He was present when bullet was extracted.   They took it out at the junction of the vertebra and twelfth rib.   Edward Carl died at the hospital from the effects of this wound.

Miss Bell Kelly testified she lived at 1238 Jefferson street, Kansas City, in the house next to No. 1240.   She had a confectionery there.   There was a little passageway between the two houses.   She knew defendant and deceased.   On the morning of the homicide she was at home in the front part of her house, and heard the pistol shot.   Immediately after hearing it she went to her front door and saw Mrs. Parker, wife of defendant, and his son, James Parker, coming out of the Parker house; Jim went towards Twelfth street and Mrs. Parker came to the house of witness and called to witness

to "go in quick, Mr. Parker had shot Mr. Carl." She went at once and met defendant in the hall. He said, "Good morning, Miss Kelly." She inquired of him where Mr. Carl was, and he said, "Upstairs, and I shot him." She went up to look for Carl and after hunting found Mr. Carl on the floor, lying on his left side facing the door with his head north. He had nothing in either hand. Asked him what was the matter and he said he was shot. She asked him what for and he said Mr. Parker asked him if he was going to get out of there, get out of his house and he said as soon as he got his pants on. "Well, he went down and got his revolver and shot me." His wife came in after he had told her this. She helped him on the bed; took his shoes off. He had on his pants and shirt, but no coat or vest. She stayed fifteen or twenty minutes and went down and said to Parker, the defendant, "Mrs. Carl sent me down and wants to know what you done with the revolver?" He said he would take care of that himself. "I need not bother about it." She asked him what he did it for, and he said a man got tired sometimes. He was sitting there putting some buttons in his shirt. Officer Carry testified he was notified of the shooting and got to the house about 7:30 that morning. He asked defendant what was the trouble around the house and he said there was no trouble. He was sitting by the window apparently fixing the cuffs of his shirt. He was cool and calm. "I told him I thought there was trouble from the appearance of the crowd outside." He then started to investigate further, having received no satisfaction from defendant. He went to another room and inquired and still got no information. When he turned from that door the defendant said, "Mr. Carry, you need not go any further; I am responsible for what occurred this morning." He saw a pistol on a couch by the window where defendant sat. He identified the pistol in evidence as the one he got there at that time. He then went upstairs and found Carl lying on the bed.

Mark J. Kelly testified he boarded at Parker's house, 1240 Jefferson street, on the day of the shooting.

Last saw Edward Carl alive that morning at breakfast about 6:30.   Carl waited on him at breakfast, there was nothing unusual about him at the time.   Deceased was working there.   He went to the grocery in the morning, waited on the table and did chamber work.   Whatever was necessary about the house.

The brother of the deceased, ex-sheriff of Barton county, testified to seeing defendant carry the pistol. The deceased was forty-one years old and weighed about 190 pounds.   The deceased was for a time employed as train director at the union station in Kansas City and later as conductor on Pullman car.   Something like a year previous to the homicide he had an accident by falling into a sewer hole and after that had no regular work until the time of his death.

The witnesses, Mrs. Steele and Mr. and Mrs. Bradley, testified to threats by deceased against defendant and to their communication.   There was evidence as to the general good character of defendant as a peaceful and law-abiding man and evidence tending to prove Carl was quarrelsome when drinking.

Other facts will be noted if necessary in the course of the opinion.

I.   The most important point discussed by counsel on this appeal is that raised by the admission of the dying declaration of deceased.   As to the preliminary objection that it was not admissible because not made under the belief that his dissolution was near at hand and after he had abandoned all hope of recovery, we think the court properly admitted it in evidence.

The surgeons had advised him that he could not live and Mr. Walker, who took down the statement, was summoned to the hospital because the surgeons regarded his death inevitable.   The fact that the wife of deceased denied that he thought he was going to die did not affect the competency of the evidence.   Upon the preliminary proof made, we think the statement so far as otherwise competent was admissible.   [State v. Draper, 65 Mo. loc. cit. 339; State v. Elkins, 101 Mo. loc. cit. 350.]

We are thus brought to the objection that portions of this statement were incompetent because it was not confined and restricted to the identification of the accused and the deceased and to the act of killing and the circumstances immediately attending said act and forming a part of the *res gestae*.

Dying declarations are admissible as to those facts and circumstances constituting the *res gestae* of the homicide, but as to all other matters occurring anterior to the killing and not immediately connected with it, they are incompetent. This is the settled law of this State. [State v. Draper, 65 Mo. loc. cit. 340, and cases cited; State v. VanSant, 80 Mo. loc. cit. 76; State v. Bowles, 146 Mo. l. c. 16; 1 Greenleaf on Ev., sec. 156; State v. Parker, 96 Mo. loc. cit. 392.]

The portions of the statement to which defendant objected, outside of those excluded by the court and included within brackets, are the following: "I never made any threats against him in my life." The State by its counsel conceded that the words "in my life" should be stricken out and the defendant objected to striking out those words without striking out the whole of that sentence.

We think the court erred in not striking out the whole of said sentence. It necessarily referred to matters anterior to the fatal encounter, was not a part of the *res gestae* and under the rule just announced was inadmissible. It can not be said that it was harmless as it tended directly to disprove the evidence of defendant's witnesses that deceased had made threats of violence toward defendant and they had been communicated to defendant.

Other parts of the statement to which exception was taken, were: "I had not touched a drop of liquor for over a month;" "I know of no reason why he shot me, except as above stated;" "and never had made a threat against him;" "I did not think he was going to shoot me, as I had never given him any cause to shoot me;" "I had never had a quarrel with him."

Each of these statements are subject to the same objection as the one above noted. They do not purport on their face to be statements of any facts which occurred at the killing. They refer either to the absence of threats anterior to the homicide or the conclusions drawn by deceased that defendant had no cause to shoot him. We think they should likewise have been excluded. [State v. Elkins, 101 Mo. 344.]

Counsel do not insist in this court that the clause, "I saw he was mad," "that was the first I knew he was mad," and the words "I spoke first and said, 'What in the world is the matter with you, Jim, what are you mad about?'" should have been excluded. Neither do we think they were incompetent. They were facts which the deceased observed then and there and the colloquy between the defendant and deceased was a part of the *res gestae,* "verbal acts," and admissible.

The admission in evidence of those parts of the statement which we have indicated as incompetent, was reversible error.

II. Instruction number 17 was not erroneous. It was in these words:

"The court instructs the jury that the statement read to you as the dying declaration of Edward Carl should be received by you as such declaration, but because it is a dying declaration you are not necessarily bound to believe it, but you will give it that weight which you think it ought to have when considered in connection with all the other facts and circumstances in evidence."

It will be noted that the court was careful to avoid the error of instructing the jury that such dying declarations should have the same degree of credit as the testimony of the deceased would have if he had testified under oath as a witness. This court, in State v. VanSant, 80 Mo. 67, repudiated the instruction given in Green v. State, 13 Mo. 382, and in giving its instruction the trial court followed State v. McCannon, 51 Mo. 160, and State v. VanSant, 80 Mo. 67.

III.   There was no error in refusing defendant's seventh instruction as the court had already fully instructed the jury as to the purpose for which the threats were admitted in evidence.

IV.   Neither was there any error in refusing instruction number 6, prayed by defendant, on the subject of self-defense.   The court fully and liberally instructed on that point in its instruction number 16.

V.   During his argument the prosecuting attorney said to the jury "Where is Jimmy Parker, the son of this defendant, who was an eyewitness to this transaction and testified at the other trial of this case; where is Jimmy Parker?"

The ground of this objection is that James Parker had not been subpoenaed nor offered by defendant as a witness.

The record discloses that defendant himself testified that he shot the deceased when he (defendant) was on the fourth or fifth step of the staircase descending into the office; that as soon as he shot he continued his descent and when he reached the bottom his daughter and his son, James Parker, were standing there.   He also testified that this son, James Parker, had testified as an eyewitness on the former trial of this case, and the record further discloses he did not testify at this trial.

In State v. Emory, 79 Mo. loc. cit. 463, this court, speaking of the contention that the judgment should be reversed on account of remarks of the prosecuting attorney, said:   "The subject of the remarks and the substance thereof was the failure of the defendant, after having the witness subpoenaed, to place him on the stand, because he knew he was guilty of the charge and was afraid he would be condemned if he did, etc.   We see no reason why it is not as legitimate for the State to call the attention of the jury to facts from which unfavorable inferences may be drawn, as it is for any other suitor in the courts."

We are cited to State v. Weaver, 165 Mo. 1, but in that case counsel for the State in his argument animadverted on the failure of two co-indictees to testify in

favor of defendant and said their failure to do so raised
a presumption of the guilt of defendant.  We held that
neither of them was competent to testify and this state-
ment was a misstatement of the law and highly in-
jurious.

In State v. Moxley, 102 Mo. 393, the remarks were
to the effect that it was the defendant's duty to have ex-
plained to his neighbors how his wife came to her death.
"The neighbors expected it of him, your neighbors ex-
pect it of you, and, gentlemen, you would expect it of
yourselves."  The defendant had not testified in his
own behalf.  This court held and most properly so,
that this was an adroit and insinuating method of avoid-
ing the plain command of the statute which forbids any
attorney to refer to the failure of an accused person to
testify in his own behalf.

It is obvious those cases are wholly dissimilar to the
one before us.  In this case defendant had testified at
length in his own behalf.  He had placed his son at the
foot of the stairway where he could readily have seen
him when he shot deceased.  This son had once testi-
fied on the trial of the case as an eyewitness.  If his
evidence would corroborate defendant the presumption
is he would have called him.  If it would not, that he
would not call him.  All that the prosecutor did was to
ask where he was.  He stated no fact which was not in
evidence.  We think it was legitimate argument.

VI.  Again it is urged that the court improperly
defined murder in the second degree because it left out
the word "feloniously."  It is just as essential to-day
as it was at common law in charging murder to charge
that the assault and homicide were "feloniously" com-
mitted, but it by no means follows that it is incumbent
on a court to use that word in its instructions to the
jury.  The object of the instructions is to advise the
jury what facts if proven will constitute the felonious
killing.  Hence, when the court instructed the jury as
it did, that if they found that the defendant willfully,
premeditatedly and of his malice aforethought did with
a revolving pistol loaded with gunpowder and leaden

balls shoot Edward Carl and inflicted upon him a mortal wound, they would find him guilty of murder in the second degree and then defined the meaning of each of the words, "willfully," "premeditatedly" and "malice aforethought" it properly gave them the elements which constituted the crime of murder in the second degree.

This court in State v. Scott, 109 Mo. loc. cit. 232, said through Judge MACFARLANE, "the word 'felonious' is descriptive of the grade of the offense, rather than the criminal act which constitutes the offense, *and ordinarily has no place in an instruction.* When used it is most frequently but a repetition of what is expressed in other and simpler words . . . and can be omitted altogether without affecting, in the least, the correctness and sufficiency of the instruction." It was also held that if used, it was wholly unnecessary to define it. [State v. Parker, 106 Mo. 223; State v. Cantlin, 118 Mo. loc. cit. 111.]

There was no error in leaving out the word "feloniously" in telling the jury the constituents of murder.

VII. There was no error in refusing to permit the defendant to prove by Mrs. Miller that at the time she heard deceased make a threat against defendant, at least eighteen months previous to the homicide and at a time defendant was not present, deceased had a knife in his hands. As ruled by the court it was wholly immaterial.

VIII. John P. Stroud, among others, testified to the good general reputation of defendant as a peaceable, law-abiding man. On cross-examination, he was asked: "Did you ever hear of Parker about four years ago at Seventeenth' and Genessee street having tried to kill his two sons? Did you ever hear of Parker at the stockyards, when he ran a saloon in the Transit House, having gotten into a shooting scrape, and shooting four times at a man, and bullets having lodged in the wall?" The witness answered he had not.

No specific objection was made to these questions at the time they were propounded, but afterwards coun-

sel said, "We object to those questions," but the court ruled they were proper and counsel then excepted.

The prosecuting attorney had a right to test the knowledge of the witness as to the general reputation of defendant by inquiring of him if he had not heard of conduct which tended to show he was not the peaceable, law-abiding man his evidence had tended to prove him to be. We think, however, it was objectionable to descend into the particulars of the number of shots fired in the Transit House difficulty.

Greenleaf lays it down that "in testing a witness who speaks to good character, it will expose the untrustworthiness of his testimony if he admits that rumors of misconduct are known to him; for the knowledge of such rumors may well be inconsistent with his assertion that the person's reputation is good. Accordingly, the propriety of inquiring whether he has not heard that the person whose reputation he has supported has been charged with this or that misdeed has usually been conceded. A few courts only, through a misunderstanding of the real purpose of the inquiry and supposing it to be in violation of the rule against proving particular acts of misconduct, have forbidden it." [1 Greenleaf, Ev. (16 Ed.), sec. 461, d. 4, p. 588, and cases collated.]

It results that the judgment in this case must be reversed and the cause remanded because of the admission of those parts of the dying declaration which we have indicated. Otherwise the record is free from error.

*Burgess* and *Fox, JJ.,* concur.