## THE STATE v. BECKNER, Appellant.

**Division Two, March 6, 1906.**

1. **REPUTATION OF DEFENDANT: When Assailed.** The reputation of a defendant, charged with a criminal offense, cannot be assailed by the State until defendant has offered proof of his reputation.

2. ————: **For Violence and Turbulence: Inadmissible.** A reputation for being violent and turbulent is not tantamount to a reputation for general bad character, and, hence, is not admissible to impeach the credibility of defendant as a witness.

3. ————: ————: **Character Not in Issue: Reversible Error.** Where a defendant has not put in issue his reputation for peace and quietude, it is not competent for the State to prove his reputation for turbulence and violence. Such testimony is directed to the impeachment of defendant in his character as a defendant, and not in his character as a witness, and its admission constitutes reversible error.

4. ————: ————: **Disproved by Defendant: Waiver.** The error committed in permitting the State to show defendant's character for violence and turbulence, when he has not put his character in issue, is not cured by defendant's afterwards introducing testimony to disprove the same.

5. ————: **Cross-Examining Witness: Entering into Details.** While the State has a right, on cross-examination, to test the knowledge of a witness testifying to defendant's good character, by inquiring of him if he has not heard of conduct tending to show that defendant was not a peaceable, law-biding man, it should not go into details, such, for instance, as the number of shots defendant was supposed to have fired at a certain house.

6. **EVIDENCE: Physical Condition of Deceased.** Defendant's testimony tending to show a great disparity in size and weight between him and the deceased, it was not error to permit the State to show the health and physical condition of the deceased before and at the time of the killing.

7. ———: **Threats.**  While the alleged threat of deceased, made a month or six weeks prior to the homicide, that defendant "would get killed or kill somebody, over that girl, if he kept on going with her," was vague and indefinite, it should have been admitted if offered in connection with or after alleged threats made on the night of the homicide.

8. **SELF-DEFENSE: Instruction.**  An instruction that "unless the facts constituting such reasonable cause" of apprehending danger "have been established by the evidence in the cause, you cannot acquit the defendant on the ground of self-defense, even though you may believe he really thought he was in danger," *held*, proper.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford*, Judge.

REVERSED AND REMANDED.

*Boyle, Guthrie & Smith* for appellant; *J. S. Brooks* of counsel.

(1)  The trend of authority is to the effect that a witness may be impeached by showing his general reputation for truth and veracity, and his general moral character for the purpose of affecting his credibility as a witness; but it has always been held in all the courts that a man's bad character for turbulence and violence could not be put in issue by the State unless the defendant had first introduced witnesses to show his character was good.  2 Wigmore on Ev., secs. 891, 922, 924; Bakeman v. Rose, 18 Wend. 146; State v. Sibley, 131 Mo. 519; State v. Pollard, 174 Mo. 607; State v. Nelson, 101 Mo. 468; State v. Smith, 125 Mo. 7; State v. Weeden, 133 Mo. 82; State v. Hudspeth, 159 Mo. 207.  The ruling was especially injurious and prejudicial in this case for the reason that five witnesses were permitted to testify as to the character of defendant as a peaceable and quiet man, or a turbulent and violent one, and thereafter was further extended so as to permit the State to examine the character witnesses which defendant introduced, to specific acts of the defendant, all of which

would have been incompetent if the court had·ruled properly in the first instance. (2) ''The prosecuting attorney has a right to test the knowledge of the witness as to the general reputation of defendant by inquiring of him if he had not heard of conduct which tended to show he was not the peaceable law-abiding man his evidence had tended to prove him to be. We think, however, it was objectionable to descend into the particulars of the number of shots fired in the Transit House difficulty.'' State v. Parker, 172 Mo. 207. (3) ·It was error to permit the State to show the health and physical condition of deceased before and at the time of the killing. It was in no way an issue in the case, and evidence to that effect was incompetent. (4) Defendant offered to show threatening language of the deceased used in reference to defendant a short while before the killing. Uncommunicated threats made by the deceased are admissible as tending to show who is the aggressor in an affray. State v. Spencer, 160 Mo. 123; State v. Bailey, 94 Mo. 316; State v. Sloan, 47 Mo. 610; State v. Harrod, 102 Mo. 609; State v. Elkins, 63 Mo. 165; State v. Nelson, 166 Mo. 191; State v. Valle, 164 Mo. 539. It may be urged that the language upon which defendant relies as a threat could not be so construed. That should be a question for the jury, and the evidence is especially valuable in view of the facts of this case, as it clearly demonstrates Brown's attitude toward the defendant at the moment the quarrel started. (5) Instruction 13 given on behalf of the State on self-defense does not properly state the law of self-defense. (a) There is no legal evidence that defendant brought on the difficulty or entered into it for the purpose of taking advantage of the deceased, and he was entitled to an instruction on self-defense clear and simple without any ' reference to bringing on or entering into the difficulty with or without the intention of taking advantage of and killing or injuring the deceased. (b) The second part of this instruction contained in the last clause which

requires the defendant to establish his defense is plainly erroneous. State v. Wingo, 66 Mo. 181; State v. Hill, 69 Mo. 451.

*Herbert S. Hadley,* Attorney-General, *Frank Blake,* Assistant Attorney-General, and *I. B. Kimbrell* for the State.

(1)   The testimony respecting the general reputation of defendant for being a violent, turbulent and dangerous person was admissible to impeach him as a witness. That any witness in a case may be impeached not only by showing that his general reputation for truth and veracity is bad, but also by showing that his general reputation for morality and for possessing the various attributes of an immoral character is bad, has been the settled law of this State since the case of State v. Shields, 13 Mo. 236, decided in 1850. State v. Shields, 13 Mo. 236; State v. Hamilton, 55 Mo. 520; State v. Breeden, 58 Mo. 507; State v. Clinton, 67 Mo. 380; State v. Miller, 71 Mo. 590; State v. Grant, 79 Mo. 133; State v. Rider, 95 Mo. 486; State v. Parker, 96 Mo. 391; State v. Shroyer, 104 Mo. 447; State v. Day, 100 Mo. 242; State v. Raven, 115 Mo. 423; State v. McLain, 92 Mo. App. 464; State v. Martin, 124 Mo. 514; Sitton v. Grand Lodge, 84 Mo. App. 208; State v. Weeden, 133 Mo. 82; State v.Pollard, 174 Mo. 608; State v. May, 142 Mo. 150; State v. Sibley, 132 Mo. 102.   (2)   But conceding that this testimony was improper before defendant opened that question, yet defendant waived and cured the error by thereafter opening up that question and introducing evidence that his reputation in this regard was good. A party can not complain that the court permitted witnesses to testify to certain facts over his objection, if subsequently he goes into the same matter brought out over his objection. State v. Goddard, 162 Mo. 226; State v. Moore, 156 Mo. 212.   (3)   No error was committed in permitting the State to cross-examine defend-

ant's character witnesses, for in testing a witness who speaks to good character, it will expose the unworthiness of his testimony if he admits that rumors of misconduct are known to him; for the knowledge of such rumors may well be inconsistent with his assertion that the person's reputation is good. 2 Wigmore on Evidence, sec. 988; 1 Greenleaf Ev. (16 Ed.), sec. 461; State v. Parker, 172 Mo. 207; State v. Crow, 107 Mo. 341; State v. Boyd, 178 Mo. 2; State v. Brown, 181 Mo. 192. (4) Objection is made because the State was permitted to show the health, physical condition and weight of the deceased at the time of the killing. This evidence was clearly admissible because defendant had introduced evidence to show that the deceased was a large man, weighing over two hundred pounds, over six feet tall and engaged in hard labor. The issue was raised by the defendant and the State had a right to rebut it. (5) The exclusion of the vague threat made six weeks before the killing did not prejudice defendant. State v. Spencer, 160 Mo. 118; State v. Smith, 164 Mo. 567; State v. Downs, 91 Mo. 19; State v. Elkins, 63 Mo. 159; State v. Evans, 65 Mo. 574. (6) Instruction 13, given on behalf of the State, is criticised by counsel for defendant for the reason that defendant was required to establish the facts constituting his defense. The instruction does not shift the burden in the case. It should be read in connection with instruction 11, which tells the jury that the burden of the proof in the case rests upon the State. Instructions similar to the one complained of have been approved in the following cases: State v. Shoultz, 25 Mo. 153; State v. Thomas, 78 Mo. 340; State v. Hicks, 92 Mo. 435; State v. Talmage, 107 Mo. 558; State v. Harper, 149 Mo. 525.

GANTT, J.—This is a prosecution for murder begun by the filing of an information in the criminal court of Jackson county, by the prosecuting attorney of said county, wherein he charges the defendant with having,

on the first day of January, 1905, at the county of Jackson in the State of Missouri, wilfully, feloniously, deliberately, premeditatedly, on purpose and of his malice aforethought, shot and killed Charles Brown.

The defendant was duly arraigned and entered his plea of not guilty. On the 8th day of May, 1905, defendant was put upon his trial, and on May 12, 1905, the jury returned a verdict finding him guilty of murder in the second degree, and assessing his punishment at imprisonment in the State penitentiary for a term of fifty years.

Motions for new trial and in arrest of judgment were filed in due time, heard and overruled, and thereupon the defendant was sentenced in accordance with the verdict of the jury, and now prosecutes his appeal from the said judgment and sentence.

The homicide occurred on the first day of January, 1905, at the house of Morgan Smitson, in the city of Independence in Jackson county, Missouri. The killing of Brown by the defendant was admitted; the defense interposed was self-defense. The killing was done with a 32 calibre revolver, and occurred about one o'clock in the morning at a dance which was then in progress at the residence of Smitson; the defendant Beckner had accompained a young girl by the name of Minnie Hook, about fifteen years of age, to the dance. The defendant himself was between seventeen and eighteen years old, at the date of the homicide, and weighed about one hundred and twenty-three pounds. The deceased, Charles Brown, was about twenty-four years old, a teamster, and weighed, when well, about two hundred pounds, and was about six feet high. The evidence tends to show that Brown came to the dance somewhat later than most of the young people, and that he did not participate in the dancing, but sat in the room where the dancing was done. The evidence tended to show that the defendant and Brown were slightly acquainted. There was no evidence of any previous quarrel or ill-

will between the defendant and the deceased, Brown.
About one o'clock in the morning, Miss Minnie Hook
notified the defendant that she was ready to go home,
and she said he went up-stairs to get their wraps pre-
paratory to leaving the house; these stairs opened di-
rectly into a middle room down-stairs; in this middle
room, at this time, the deceased Brown, together with
O. F. Bolan and Clarence Leftwich, were seated to-
gether on the edge of a dresser; Miss Minnie Hook came
down the stairs with defendant immediately behind her
and passed toward and in front of the deceased Brown;
as she passed, the deceased asked her "if she was going
home," according to the testimony of the witnesses for
the State, but according to the witnesses for the defend-
ant, he asked her "if the defendant was making her go
home?" All the witnesses agree that this remark was
made to the young lady in a polite and gentlemanly
manner, and was not made to the defendant at all.
Thereupon the defendant stepped in front of deceased,
and within two or three feet of him (the deceased still
remained seated on the dresser), and said to deceased,
"What is it to you, you big son of a bitch?" The defend-
ant testified that he said to him, "You keep your big
mouth out of it." The defendant's brother, Jacob, says
the defendant said, "Keep your damn head out of it."
They all agree, however, that up to this time the de-
ceased had not said a word to the defendant, and had
remained seated on the dresser; when the defendant
thus spoke to the deceased, the latter arose from the
dresser and said, "Don't call me a big son of a bitch,"
or words to that effect. A scuffle then ensued, and the
deceased took hold of the defendant. There is a sharp
conflict at this point; the testimony on the part of the
State's witnesses in the case was to the effect that the
deceased took hold of the defendant by the arms and
seemed to be holding him in order to prevent the de-
fendant from pulling his pistol from his hip pocket,
whereas, on the part of the defendant, the evidence

tended to show that the deceased Brown grabbed the defendant by the throat and was choking him and pushed his head back, and backed him across the room, and that, in this position, the defendant pulled his pistol out of his right-hand hip pocket and shot Brown through the abdomen; he shot twice, one shot missing the deceased, and the other penetrating his body to the back bone, from which wound Brown died in a very few minutes. There was no evidence that the deceased was armed in any way. After the shooting, the defendant hurried away from the house to the home of Miss Hook, and after leaving her, he went to the Missouri Pacific railroad yards where he took a freight train, on which he rode to Lees Summit; he went to the home of his aunt, and from there went out in the country to visit another aunt, eight miles east of Lees Summit, at which latter place he remained about a week when he returned to Kansas City and gave himself up.

At the close of the defendant's evidence in chief, the State offered various witnesses for the purpose of impeaching the general reputation of the defendant, for peace and good order, and to show that his general reputation was that of a violent, turbulent and dangerous man, over the objections and exceptions of the defendant. Thereupon the defendant offered evidence on his part tending to prove that his general reputation was that of a quiet, peaceable, law-abiding citizen. The other facts and the instructions will be noted in the course of the opinion.

I.  Various errors are assigned for the reversal of the judgment herein, but the most important and serious question raised by the defendant is as to the action of the court in permitting the prosecuting attorney, over the objection of the defendant, to call various witnesses and to propound to them this question: "Do you know the general reputation of the defendant for peace and quietness or turbulence and violence in the neighbor-

hood where he lives?'' In this State, from a very early period, it has been the uniform rule of decisions that the character of a defendant, charged with a criminal offense, cannot be assailed by the State until the accused has offered proof as to his character, or, in other words, put his character in issue. [State v. Creson, 38 Mo. 372; State v. Martin, 74 Mo. 547; State v. Palmer, 88 Mo. 568; State v. Hart, 66 Mo. 208; State v. Hudspeth, 159 Mo. 178.] And this is the general doctrine announced by trustworthy commentators on Criminal Law. [Wharton's Criminal Evidence (9 Ed.), sec. 64, and cases cited; 3 Greenleaf's Evidence, sec. 25; State v. Hull, 20 L. R. A. 609, and cases collated in the note.] The criminal court, however, admitted this evidence on the ground that the defendant had offered himself as a witness and, having done so, he occupied the position of any other witness, and was liable to be cross-examined as to any matter pertinent to the issue and might be contradicted and impeached as any other witness, and subjected to the same tests.

At a very early day in the judicial history of this State and before the defendant was permitted to testify in his own behalf, it was held, in State v. Shields, 13 Mo. 236, that for the purpose of discrediting a witness, the opposite party is not restricted to inquiring into the general reputation of such witness for truth and veracity, but may inquire as to the witness's moral character generally. NAPTON, J., speaking for the court, said: ''It seems to be a better and more settled opinion, in discrediting a witness, a party is not restricted to inquiries into the character of the witness for veracity. A bad moral character generally, or a depravity not necessarily allied to a want of truth, may yet to some extent shake the credibility of the witness, and, therefore, is a fair subject of investigation. The questions propounded in this case were proper, although they must necessarily, to have had any sensible impression upon

194 Sup—19

the case, been followed by others eliciting the opinion of the witness upon the effect which the general or specific moral depravity spoken of, had upon the credibility of the witness attacked. The entire exclusion of the question seems to have proceeded upon the ground that general bad character was inadmissible, unless it was general bad character for truth and veracity.'' [Day v. State, 13 Mo. 422.]

The doctrine thus announced has been followed in this State from that day until the present. It was first applied to the impeachment of a defendant, in State v. Clinton, 67 Mo. 380. In that case Judge NORTON, speaking for this court, said: ''This presents a question of the first impression in this court, and involves a construction of the act of 1877 (Laws 1877, p. 356) which provided'' that no person shall be rendered incompetent to testify in criminal causes by reason of being the person on trial or examination; and then reached the conclusion, ''in the light, both of authority and reason, our opinion is that a defendant, who, at his option, becomes a witness under the act of 1877, occupies the position of any other witness; is liable to be cross-examined as to any matter pertinent to the issue; may be contradicted and impeached as any other witness, and is to be subjected to the same tests. Under the rule adopted in this State and first enunciated in the case of State v. Shields, 13 Mo. 236, and followed in the cases of Day v. State, 13 Mo. 422; State v. Hamilton, 55 Mo. 520; State v. Breeden, 58 Mo. 507, the question propounded as to the general character of defendant was a proper one.'' That ruling was adhered to in State v. Miller, 71 Mo. 590. In State v. Grant, 79 Mo. 133, the question again arose and Judge SHERWOOD, speaking for the court, reasserted that in this State the witness may be impeached not only by a general reputation as to veracity, but the inquiry may extend to the general moral character or reputation of the witness, citing all the cases above noted.

In State v. Rider, 90 Mo. 54, and the same case in 95 Mo. 486, it was said by this court: "The court in this, as in the formal trial, after the defendant had testified as a witness in his own behalf, permitted the State to introduce evidence as to his general reputation for truth and veracity, chastity and morality. It was not held to be error then, and we see no good reason for holding so now. It is in harmony with all the rulings of this court on that subject since the adoption of the statute permitting a defendant in a criminal case to testify in his own behalf." The same doctrine is announced in State v. Shroyer, 104 Mo. 447; State v. Raven, 115 Mo. 419; State v. Martin, 124 Mo. 514; State v. Weeden, 133 Mo. 82; State v. Sibley, 132 Mo. 102; State v. May, 142 Mo. 150. The last announcement on this subject is in State v. Pollard, 174 Mo. 607, in which Judge Fox said: "We will say in respect to this complaint, that the learned trial judge accepted and followed the rule adopted by a long line of decisions in this State, commencing with the case of State v. Shields, and followed in the cases [citing all the cases hereinbefore referred to]. These cases announce the rule as to the impeachment of witnesses, that the inquiry need not be confined to the trait of character in issue, but may be extended to general moral character. In view of the long and uniform adherence as announced in the cases quoted, and as this only constitutes one division of this court, I will not undertake to overrule the doctrine thus announced, but will say for myself, that the rule upon the impeachment of witnesses should be restricted to the trait of character directly involved, that of truth and  veracity."

Thus we have two well-defined rules of law which apparently conflict. When a defendant, under statutes like ours, is permitted to testify, and he avails himself of his privilege, it is at once obvious that he occupies a dual position, that of witness and accused. As already seen, unless the defendant has first offered evi-

dence of good character in exoneration from the crime charged, the State has no right to attack his character as bad, and even when this is the case, the approved rule is that both the defendant and the State are restricted to evidence as to his character pro and con as to the specific trait involved in the controverted act or offense; in a word, the proof of character offered as a defense to a charge of crime and evidence rebutting such character must be such as bears analogy and reference to the nature of the charge on which the defendant is being tried. [1 Wigmore on Ev., sec. 59, and cases cited in note.] The ground upon which such testimony is admissible is that good character tends to lessen the probability of guilt. [3 Greenleaf's Ev. (15 Ed.), sec. 25; State v. Anslinger, 171 Mo. 1. c. 608-9; State v. Dalton, 27 Mo. 1. c. 15, 16; State v. King, 78 Mo. 556.]

On the other hand, the defendant in his character as a witness is not entitled to offer his good character in evidence to corroborate his testimony until it has been attacked by the State. [2 Wigmore on Ev., secs. 891, 1104.]

The difficulty arising out of the foregoing rules, when a statute like ours permits a defendant in a criminal prosecution to testify in his own behalf, has been encountered by the courts of last resort in many of the States, as it was by this court in State v. Clinton, 67 Mo. 380. In Lockard v. Commonwealth, 87 Ky. 201, under a statute very similar to ours on this subject, the defendant testified in his own behalf, but offered no evidence as to his character. The Commonwealth then introduced several witnesses, who were, over the appellant's objection, permitted to testify that while they knew nothing of defendant's character for truthfulness, yet his general moral character was bad. In Kentucky, as in this State, it had been decided at an early day that evidence of the general moral character of a witness was admissible upon the ground, as was said in the case of Tacket v. May, 3 Dana 80, that "a witness

whose moral character is bad, is not as credible as one whose moral character is good.'' HOLT, J., speaking for the whole court, discussed the effect of the statute in view of the settled rule of decision in that State that the general bad character of any witness might be shown to impeach him. He met the objection urged by many law-writers and many able judges, that the impeachment of the general moral character of a defendant as a witness would affect him as a defendant, and would violate the rule that until he put his character in issue, the State could not assail it, and said, ''When, however, the defendant becomes a witness, he voluntary assumes another character,'' and reached the conclusion that public policy and individual safety forbid that his reputation for veracity should then be beyond inquiry; that if the testimony of disinterested witnesses may be impaired and destroyed by evidence of general bad moral character, why should not a defendant's as a witness, be open to like attack? The court held that these considerations must prevail over the suggestion that if the general moral character of the accused, when he becomes a witness, can be assailed, it is in effect a violation of the rule that in a criminal case the defendant alone can put it in issue.

Among many other cases the court expressly approved State v. Clinton, 67 Mo. 380. In Alabama, as in this State, the rule of decision has long been that a witness might be impeached by assailing his general moral character, and when a defendant offers himself as a witness, he is subject to impeachment by assailing his general moral character, but it is held by the Supreme Court of that State, in Clark v. State, 78 Ala. 474, that when it was said that his general moral character could be impeached, ''only so much of his moral character as reflected on his credibility as a witness was open to assault by the State in the first instance,'' and in Dolan v. State, 81 Ala. l. c. 19, after citing Clark v. State, as showing that only so much of his moral character as

reflected on his credibility as a witness was open to assault by the State in the first instance, it is said: "A character for violence or turbulence sheds no light on the credibility of a witness; and such testimony was not admissible, unless the defendant had first put his character for peace in issue." Whatever may have been the differences in this court as to whether certain specific traits of immorality affected the credibility of a witness, it is clear that the case of State v. Shields, 13 Mo. 236, which is the foundation for the rule that in impeaching a witness the inquiry may extend to his moral character generally, is predicated upon the ground that the loss of moral principle evidenced by the practice of a particular vice affects his credibility. But accepting this as the established rule, was it competent for the State to assail the defendant's character before he placed his character in issue, by proving that he was a violent and turbulent man? As we have already seen, the Alabama court, while adopting the rule that when a defendant offered himself as a witness he could be impeached by proving his general bad character for morality, yet rejected evidence in a homicide case of the character for violence or turbulence as casting no light on his credibility. It will be observed that the question propounded to the impeaching witnesses in this case did not involve his general reputation for truth and veracity, nor his general reputation for immorality, but was confined to the specific charge as to his reputation of being a violent and turbulent man. This evidence, we think, was not directed to the impeachment of the defendant in his character as a *witness,* but was direct evidence tending to impeach his character *as a defendant* only for turbulence and violence, when he had not put his character in issue. In State v. Nelson, 101 Mo. 464, it appears that the defendant had offered evidence that Ferrill, a witness for the State, had the reputation of being a rash, dangerous and turbulent man when in liquor. On this point, Judge BLACK, speaking

for the whole court, said: "Nor was there any error in excluding the evidence offered by the defendant to show that Ferrill, one of the witnesses for the State, had the reputation of being a rash, dangerous and turbulent man when in liquor. We do not see for what purpose this evidence was offered, unless it was to discredit the evidence given by Ferrill, and it was certainly not competent for that purpose." In State v. Smith, 125 Mo. 7, it was ruled that a conviction of assault and battery was not admissible to impeach a witness, on the ground that it did not affect his general moral character. After a careful examination, we have been unable to .find any case that goes to the extent of holding that the mere fact that a man has a violent and turbulent disposition tends to prove that he is unworthy of belief; on the contrary, as we have seen, the Supreme Court of Alabama, and this court, have ruled to the contrary.

In Kitteringham v. Dance, 58 Iowa l. c. 634, it was proposed to show that a witness had been indicted for assault and battery, and the court excluded the offer. The Supreme Court of Iowa, discussing the admissibility of this evidence, said: "The last section provides the general character of a witness may be shown for the purpose of testing his credibility. Counsel have not seen proper to give any reason for the thought implied, that an indictment for assault and battery would impair the moral character of a witness. We do not believe such a proposition is true. The assignment of error under consideration is not well taken." This case is entirely in harmony with the decision in State v. Smith, supra.

In our opinion our esteemed brother of the criminal court erred in holding that a reputation for being violent and turbulent was tantamount to evidence of a reputation of general bad character and admissible to impeach the credibility of the defendant as a witness. Had the defendant offered evidence of his character for

peace, quietude and good order, there can be no doubt whatever that it would have been competent then for the State to have rebutted such evidence, by proving that he was a quarrelsome, turbulent and dangerous man, as tending to prove he was the aggressor, but it was not competent for the State to make this proof until the defendant had first put his character as a peaceable or violent man in issue. It seems clear to us that this evidence went directly to the character of the defendant as a defendant in the case and not to his credibility as a witness, and this being so, we must hold it was reversible error. And if we are right, it was not cured by the fact that the defendant sought to mitigate the effect of this evidence by offering evidence in his own behalf tending to prove that his reputation for peace and quiet prior to the homicide was good. Indeed, the error in the first instance was accentuated by the fact that when the defendant did offer evidence tending to show his good reputation for peace and good order, the prosecuting attorney was permitted to examine defendant's character witnesses as to alleged specific acts of bad conduct by defendant towards other persons. We do not desire to be misunderstood on this point; if the defendant had, in the first instance, tendered his character for peace and quiet, it would have been competent for the prosecuting attorney to have tested the credibility of the defendant's character witnesses, by inquiring of them if they did not know or had not heard of the various breaches of the peace and criminal conduct on the part of the defendant, as he did, but until the defendant had made his character in this respect an issue in the case, it was clearly improper to have admitted evidence of his bad character, which did not tend to affect his credibility.

II. But it is insisted by the Attorney-General that, conceding that the testimony was improper before the defendant opened the question, the defendant waived and cured the error by thereafter opening up that ques-

tion and introducing evidence that his reputation was good. In support of this contention, we are cited by the learned counsel for the State to State v. Moore, 156 Mo. l. c. 212, in which it was held that where the defendant of his own accord elicited the same evidence that had been improperly admitted for the State, he removed his objection to it; an examination of that case, however, will show that the matter brought out was entirely harmless, and that the defendant subsequently, of his own accord, proved the same fact. It is clear that that case is no authority for the proposition advanced now by the Attorney-General, that the defendant is in no position to complain of this evidence. To the same effect is State v. Goddard, 162 Mo. 226. In this last-mentioned case, the defendant elicited the same fact from which guilty knowledge might be drawn. The distinction between the error assigned in this case and that in the two cases just noted is, that the defendant in those cases voluntarily elicited the same evidence to which he had objected when introduced by the State, whereas, in this case, he objected and protested against the admission of the testimony tending to prove that he was a turbulent and violent man, and saved his exceptions to the ruling of the court, and then to negative and destroy the effect of that evidence improperly admitted, he was driven to the effort to rebut that evidence and prove the contrary. In a word, he was compelled over his objection and exception to meet an issue which was improperly injected into the case. He did not prove nor offer to prove the same fact that was shown by the State's evidence. In Cochran v. Railroad, 113 Mo. l. c. 366, it was said: "It must be remembered that a defendant occupies a different attitude from his adversary, the plaintiff. The plaintiff brings the action. If the ruling is adverse, he may take a nonsuit. Not so with the defendant. He is in court without his consent. The court may make any number of rulings that he may deem erroneous, but he cannot abandon the case; he is

in court and must remain till the cause is finished. He has a right to tender as many defenses as he has. If the court erroneously deny him one, he must avail himself as best he can of those remaining. He, however, advises the court and his adversary of his claim, and if he submits, as he is bound to do, to the ruling of the court, and tries his case in accordance with the judgment of the trial court, on what principle is he estopped from complaining of the action of the trial court and his adversary in forcing him to fight the battle upon ground selected by them and at a great disadvantage to him? We see no element of estoppel in such a case.''

This statement of the law was approved in Glover v. K. C. Bolt & Nut Co., 153 Mo. l. c. 342; Warwick v. Investment Co., 112 Mo. App. 633; and Currell v. Railroad, 97 Mo. App. 93. In our opinion, the defendant did not waive his objection and exceptions to the evidence introduced assailing his character for turbulence and violence by offering evidence to disprove the same. No other recourse was left to him by the ruling of the court and the action of the State.

III. While the prosecuting attorney has a right to test the knowledge of a witness as to the general reputation of the defendant by inquiring of him if he had not heard of conduct which tended to show he was not the peaceable, law-abiding man his evidence has tended to prove him to be, we think it was objectionable to permit the prosecutor to enter into all of the details as to the number of shots fired at the Williams house. [State v. Parker, 172 Mo. 207.]

IV. We think there was no error committed in permitting the State to show the health and physical condition of the deceased before and at the time of the killing. The testimony on the part of the defendant tended to show the great disparity in size and weight between the defendant and the deceased, and the State's evidence was permissible on that question.

Error is assigned on the refusal of the court to permit the defendant to prove by witness Frazer that at a dance at Independence, a month or six weeks before the homicide, the deceased was heard, by the witness, to make a remark that the defendant "would get killed or kill somebody, over that girl, if he kept on going with her." The objection to this was sustained for the reason that it was improper at that time. No effort was made to introduce it at a later stage of the trial. The court did permit evidence of alleged threats made on the night of the homicide. While the alleged threat was very indefinite and vague, we are inclinded to think is should have been admitted if the defendant had offered it in connection with or after the other threats had been introduced. [State v. Nelson, 166 Mo. 191; State v. Spencer, 160 Mo. 123, and cases cited.]

V. The 13th instruction given by the court of its own motion is challenged by the defendant on two grounds: first, that there was no legal evidence in the case tending to prove that the defendant brought on the difficulty with a purpose of taking advantage of the deceased, or if killing or inflicting great bodily harm upon him. With this contention we are entirely unable to agree. As the case must necessarily be retried, we refrain from summing up the evidence on this point further than to say that we think the evidence furnished ample proof to sustain the instruction on this point. Secondly, it is insisted that the court erred in the last clause of the instruction, in instructing the jury that "unless the facts constituting such reasonable cause have been established by the evidence in the cause, you cannot acquit the defendant on the ground of self-defense, even though you may believe he really thought he was in danger." This identical instruction was approved by this court in State v. Shoultz, 25 Mo. l. c. 153; State v. Thomas, 78 Mo. l. c. 340; and State v. Hicks, 92 Mo. l. c. 435. The instruction simply means that it is not sufficient to support the plea of self-defense that a

defendant *believed* that his life was in imminent peril to justify him in taking the life of his adversary, but that there must appear that he had reasonable cause to apprehend such danger, and such reasonable cause for such apprehension must be established by the evidence. It does not entail upon the defendant, as the learned counsel claim, the burden of establishing his innocence, but simply that, from all the evidence, it must appear to the jury that there was sufficient cause for the defendant to apprehend that his adversary was about to slay him or do him some great bodily harm, and that it was imminent. For the error noted in the admission of the evidence assailing the defendant's character as a turbulent and violent man before he had offered any evidence to prove that he was a peaceable and law-abiding one, the judgment must be reversed and the cause remanded.

*Burgess, P. J.,* and *Fox, J.,* concur.