THE STATE v. JOHN BROOKS and AMELECK BROOKS, Appellants.

Division Two, March 5, 1907.

1. **JUROR: Opinion: Trial Court's Discretion.** Whether or not a juror on his *voir dire* examination has falsely stated that he has not formed or expressed an opinion as to defendant's guilt or innocence, is a matter of fact for the trial court to determine, and the appellate court will not interfere with its finding unless it has clearly abused its discretion.

2. ———: ———: ———: **New Trial: Hearing Evidence.** Where in support of their motion for a new trial, defendants introduce affidavits of parties to the effect that prior to the trial they had heard one of the jurors who tried the case say that defendants should be hung, it is competent, in rebuttal, to call the juror to deny the statement attributed to him, and to offer evidence as to the good character of the juror and the bad character of the affiants; and the finding of the trial court who heard the evidence will not be disturbed.

3. **REASONABLE DOUBT: Instruction.** An instruction on reasonable doubt and presumption of innocence, set out in the opinion, while not happily worded, is *held* sufficient.

4. **FORMER CONVICTION: Record: Credibility of Witness.** Where, in a prosecution for murder, defendant testified in his own behalf, it was competent, in rebuttal, to introduce in evidence the record of his former conviction of manslaughter for the purpose of affecting his credibility as a witness.

5. **REMARKS OF COUNSEL: No Exceptions: Affidavits.** Alleged improper remarks of counsel cannot be shown by affidavits, but, in order to be reviewed, they must be objected and excepted to at the time they are made, and preserved in the bill of exceptions.

6. **MURDER, FIRST DEGREE: Conflicting Evidence: Sufficiency.** It was the province of the jury to settle conflicts in the testimony, and there was ample evidence to support their verdict finding defendants guilty of murder in the first degree.

Appeal from Iron Circuit Court.—*Hon. Joseph J. Williams*, Judge.

AFFIRMED.

*D. L. Rivers* and *Chester H. Krum* for appellants.

(1) The court erred in refusing a new trial as moved for on the ground of the misconduct and disqualification of juror Lashley. (2) The action of the court in admitting evidence of the good general reputation of juror Lashley for "truth, integrity, honesty and general moral character," cannot be reconciled with a notion of orderly procedure. (3) The instruction on reasonable doubt, given by the court, is unintelligible. (4) The admission of the record of conviction of Ameleck Brooks was a fatal error. 1. The statute—section 4680—does not apply to a defendant in a criminal case. It was not so intended by the Legislature. 2. The statute does not provide that the conviction must be admitted in evidence whenever it is offered in the case of a defendant who has testified in his own behalf. What the statute means, if applicable to a de-

fendant in a criminal case, is that it may be admitted in cases where, if introduced, it would properly affect his credibility. 3. The evidence offered went to the character of the defendant and not to his credibility as a witness. State v. Becker, 194 Mo. 281. (5) The course of counsel for the State, in argument, whether or not rebuked by the court, was utterly unwarranted, and should cause a reversal of the judgment.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) Charles Lashley was a competent juror in this case, as his *voir dire* examination clearly shows. He disclosed the fact then to defendants, to their counsel, and to the court, that he had formed an opinion at the start, based upon what he had heard; but that he kept on hearing so much about the killing that he came to the conclusion that he knew nothing whatever about it, and that he concluded not to form an opinion till he heard the evidence in court. After hearing this juror state these facts, defendants made no objections to him; hence, they cannot afterwards be heard to complain of his acceptance as a juror. Lisle v. State, 6 Mo. 426. (2) Counsel for defendant criticise the trial court for permitting evidence to be introduced tending to sustain the good reputation of juror Lashley, and evidence to be introduced tending to impeach the character of the three who made affidavit that the juror had expressed an opinion prior to the trial. Instead of the proceeding being "extraordinary," it may be said that our courts would be a farce if verdicts could be set aside simply because some persons were found who would make an affidavit against one of the twelve jurors. In receiving the testimony of the juror, in receiving evidence from some of Iron county's best citizens that the juror was a man of good character, and in receiving evidence that the three affiants were not men of good character, the

trial court acted wisely, and as many other courts have acted in similar cases. It is nothing uncommon for affidavits to be filed similar to the ones filed in this case; and the universal rule is to permit the State to file counter-affidavits. Such has been the rule, and it has been recognized by this court, and this court has approved of it, by deferring to the action and finding of the trial court in such matters. State v. Dusenberry, 112 Mo. 295; State v. Taylor, 134 Mo. 294; State v. Latimer, 116 Mo. 524; 1 Bishop's New Crim. Proc., secs. 949a, 949b; State v. Gordon, 191 Mo. 133; State v. Spaugh, 200 Mo. 571. (3) No error was committed in the matter of giving and refusing instructions. State's instruction 5, on the subject of reasonable doubt, is correctly and properly worded. State v. Thomas, 78 Mo. 341. (4) Neither was error committed in permitting the State to offer in evidence in rebuttal the records of the Iron Circuit Court, showing that the defendant Amaleck Brooks had been convicted of manslaughter and had been sentenced to serve a term in the penitentiary. This evidence was offered and admitted for the purpose of affecting the credibility of said defendant, who had testified not only in his own behalf, but also in behalf of his co-defendant. Sec. 4680, R. S. 1899; State v. Spivey, 191 Mo. 111; State v. Woodward, 191 Mo. 633; State v. Blitz, 171 Mo. 540; State v. Thornhill, 174 Mo. 370. In connection with the admission of said evidence, the State's instruction on the subject of the conviction of defendant Ameleck Brooks (instruction 8) has been approved by this court. State v. Heusack, 189 Mo. 312. (5) The bill of exceptions must show that the improper remarks of the attorney were made, that the defendant objected to them at the time; that his objections were overruled by the court and that defendant saved his exceptions at the time. The record in this case wholly fails to show either one of said imperative requirements. State v. McCarver, 194 Mo.

740; State v. Meals, 184 Mo. 260; State v. Bulling, 105 Mo. 226.

GANTT, J.—On the 27th of September, 1905, the prosecuting attorney of Iron county filed an information, duly verified, charging the defendant John Brooks with murder in the first degree of John Clemonds, and in the same information charging Ameleck Brooks with being present, aiding, assisting and procuring John Brooks in commission of said murder. The defendants were duly arraigned and put upon their trial at the April term, 1906, of the Iron County Circuit Court, and were both convicted of murder in the first degree. In due time they filed their motions for a new trial and in arrest of judgment, which were overruled, and they appeal to this court.

The evidence on behalf of the State tended to show that defendants were and are brothers, and, on the day of the homicide, resided in the town of Graniteville, in Iron county. A railroad runs east and west through the town of Graniteville, and the main street crosses this railroad track at right angles. On the south side of the railroad track and on the west side of this main street, was situated Kerwin's saloon on the date of the homicide herein described. This saloon was a few feet west of the street and about thirty feet south of the railroad track, and the building was about forty-five feet in length from east to west. Between this saloon and the railroad track was situated a rack for tying horses. The saloon had two windows opening to the north, a front door on the east, and a back door on the west end. On the east side of this main street and also south of the railroad track, was another saloon known as Steffen's. On the 12th of August, 1905, between seven and eight o'clock in the evening, Ameleck Brooks was in Steffen's saloon, and saw one Gus Mead sitting on the ground near the railroad track northwest of Ker-

win's and the railroad. In company with Mead there were several others and they were all drinking beer out of a can. It was sufficiently light for people to see and recognize the members of this party from the main street. When Ameleck Brooks saw Mead and his crowd he took off his coat and gave it to Ed Belcher to hold for him and said, "Watch me." By the side of Mead on the ground was a double-barrel breech-loading shot gun, both barrels of which were loaded with BB shot. Mead testified that he had started out into the field to fire off his gun in order to clean it, and met these friends and stopped to drink with them. The testimony for the State tended to show that Ameleck Brooks ran up behind Mead and began to assault him. Mead resisted and got hold of his gun, when Ameleck Brooks also grabbed it and called to his uncle William to come and help him; that John Brooks, the other defendant, rushed in at this stage of the difficulty, and drew his knife and forced Mead to give up his gun. John Brooks then compelled Mead's companions to stand back and permit Ameleck Brooks to punish Mead by pounding him. It appears that the difficulty between Ameleck Brooks and Mead grew out of some remarks which Ameleck Brooks attributed to Mead derogatory to Ameleck. Mead insisted that he had not made the remarks, but that they had been made by John Clemonds. Having punished Mead, Ameleck Brooks called the deceased by name, and said that if he had any nerve he would come out and show himself. Ameleck then said to his brother John, "Shoot the first son of a b—that shows his head around the corner." Or, as some of the other witnesses testify, "Shoot John Clemonds, the son of a b—,when he shows his head around the corner." The testimony indicates that the deceased also went by the name of John Hall, and some of the witnesses testified that Ameleck alluded to him as John Hall. On the part of the State the evidence

further shows that while this assault on Mead was being perpetrated, the deceased, John Clemonds, was standing in front of Kerwin's saloon, and apparently ignorant of the fight that was going on on the north side of it. Hearing his name called, he walked around the corner to the north and west and a few feet from the corner of the saloon, when he saw John Brooks with a shot gun in his hand pointing towards him. The State's testimony tended to establish that as the deceased went around this corner in the direction of the fight, he passed between Belcher and the corner. When he discovered John Brooks, the defendant, with a shot gun, deceased turned and walked back towards the front of the saloon. Some one fired a pistol shot about this time and the shot took effect in the left lung of Ameleck Brooks, and almost simultaneously John Brooks fired the shot gun and the load took effect in the back of the deceased just above the left hip. The deceased fell on his face about three feet east of the hitching rack, his face being in an opposite direction from John Brooks. Immediately after he was shot several persons took the body of the deceased into Kerwin's saloon, but the bartender suggested that it was too warm in there and they took him out and laid him on the ground. In the deceased's pocket was found a 38-calibre pistol, which was taken possession of by his brother, and later in the evening was turned over to the sheriff of the county, Mr. Marshall, who produced it at the trial. The evidence tended to show that there was one empty shell in the revolver, and four loaded cartridges. The State's witnesses who were nearest to the deceased at the time he was shot were positive that deceased never fired a pistol at either of the defendants; that he had no pistol in his hand and made no motion whatever indicating an attempt to use said pistol. These witnesses also testified that some one at least thirty feet from the deceased fired the pistol which wounded Ameleck Brooks. There was also evi-

dence of threats made by Ameleck Brooks against the deceased at different times and places prior to the time of the homicide. Dr. Marshall, a physician residing in Ironton, was summoned and examined the body that night about ten o'clock, and he testified that he found about fifty shot had entered the back of the deceased producing the wound which caused his death.

On the part of the defendants the testimony tended to prove that Ameleck Brooks felt indignant at something Gus Mead had said about him and concluded he would chastise him; accordingly, he began striking Mead and when Mead resisted, Ameleck called for his uncle and his brother to aid him; that John Brooks then took Mead's gun from him and stood guard while Ameleck finished his fight with Mead. In the course of their engagement, Mead denied the statements attributed to him and said that the deceased had made said statements, whereupon Ameleck called to the deceased to come out and own up if he was the man, and say who did it. Defendant John Brooks testified in his own behalf that about seven thirty o'clock on the evening of the homicide, he saw the deceased coming around the corner of Kerwin's saloon with a revolver in his right hand. "When he came around he was pointing it directly at me and I told him to stop, and he kept on coming, and I told him to put the revolver up, and just then he raised the revolver on him and fired." He was between fifteen and twenty feet of Ameleck when he fired, and then turned right around towards me with it; Ameleck holloed "Oh! brother, come here, I am killed." "I had the shotgun that I took away from Gus Mead, and I seen he was going to kill me and I raised the gun and fired at him." On cross-examination, the defendant, John Brooks, stated that Ameleck was standing near Gus Mead when Clemonds, the deceased, shot him. The fight between Mead and Ameleck had ended; that de-

ceased had his left side towards the defendant and after being shot faced to the right and fell. Ameleck Brooks, the other defendant, testified that he first saw the deceased on the 12th of August, between seven and eight o'clock in the evening. The first time he saw him deceased was standing in front of Kerwin's saloon, and the second time he saw him he had a revolver leveled at defendant Ameleck. He was not facing Clemonds, the deceased, before the latter fired, but turned as he did so, the deceased fired, the ball hitting the witness just above the left nipple. He denied telling John Brooks to shoot the deceased. The defendant also introduced evidence tending to show that the deceased was seen in Graniteville that evening with a pistol in his pocket. L. D. Hinch testified in behalf of the defendants that he saw Clemonds, the deceased, coming out of the saloon, heard two shots, a couple of seconds apart, one being a pistol shot, saw Clemonds come out of the saloon with a pistol in his hand, saw him fire, saw a man come around the corner of the saloon with a revolver in his hand, which was fired; this was Clemonds, the deceased; heard Ameleck Brooks call out, "I am killed," and just then a shotgun was fired. Did not hear Ameleck call for Clemonds and did not hear Ameleck tell John Brooks to shoot.

In rebuttal the State proved that prior to this trouble Ameleck Brooks had been convicted of manslaughter by the circuit court of Iron county and had served a term in the State penitentiary. Other facts necessary to the understanding of the opinion will be noted in the consideration of the propositions advanced by the defendants for the reversal of the cause.

I. The first assignment of error is founded upon the alleged misconduct and disqualification of one of the jurors, Charles Lashley, and it is alleged in the motion for new trial that he had formed and expressed his opinion of the guilt of the defendants prior to

his examination on his *voir dire* and failed to disclose the same on his examination, and that this fact came to the knowledge of the defendants after the rendition of the verdict. In support of this ground for new trial, the defendants filed the affidavits of Frederick Mayes, Gentry Harbison and Sherman Barnes, to the effect that at the Hub Mill in Ironton in March, 1906, and before the trial of the defendants, they heard the juror Lashley, while speaking of the defendants John and Ameleck Brooks and the homicide for which they were subsequently tried, say that the Brooks boys ought to be hung, and in connection with these affidavits the defendants filed the affidavits of themselves and their counsel that the knowledge of the juror having expressed his opinion of the guilt of the defendants first came to their knowledge after the rendition of the verdict. Upon the hearing of the motion, the prosecuting attorney called the juror Lashley in rebuttal of the said affidavits, and he denied having made the statements attributed to him by Mayes and Harbison, and there was also an oral examination of Mayes and Harbison before the court. After hearing the testimony pro and con and also evidence as to the good character of the juror Lashley, the court overruled the motion for new trial on this ground. Whether a juror on his examination has falsely stated that he has not formed or expressed an opinion as to the guilt or innocence of the defendant is a matter of fact which the circuit court must determine, and this court must be convinced that there has been a clear abuse of discretion before it will interfere with the finding of the trial court on such an issue. [State v. Gordon, 191 Mo. l. c. 133.] The juror having been charged with a grave offense, it was entirely competent for the State to offer evidence of the bad character of the affiants whose testimony had been introduced against him, and we see no objection to the introduction of the testimony tending to show that the juror was a man of good character.

The whole matter was in the discretion of the trial court as to the course that should be pursued in trying the question of the juror's alleged misconduct in failing to answer truthfully on his *voir dire* examination.

II. Among other instructions the court gave the following:

"5. You are further instructed that the defendants, in law, are presumed to be innocent, and that it devolves upon the State to prove, by evidence, to your satisfaction, beyond a reasonable doubt, that the defendants committed the crime, as charged in the information, and explained in these instructions, and if, upon a view of the whole case, you have a reasonable doubt of the guilt of the defendants, or of that of either of them, you will give them, or either of them of whose guilt you have a reasonable doubt, the benefit of such reasonable doubt, and acquit them, or either of them, of whose guilt you have a reasonable doubt. But a reasonable doubt of the guilt of defendants, or either of them, to authorize an acquittal of them, or of either of them, on the ground of such reasonable doubt of guilt must be a substantial doubt of the guilt of the defendants, or of the defendant as to whose guilt you have such reasonable doubt, formed by you on a careful consideration of all the facts and circumstances proven in the case, and not a mere possibility of the innocence of the defendants, or of that of either of them."

Counsel for the defendants assail this instruction as unintelligible. We do not think that the instruction is obnoxious to this criticism. It gives the defendants and each of them the presumption of innocence, and requires the State to prove the guilt of defendants and each of them beyond a reasonable doubt, but advises the jurors in effect that they might convict one and acquit the other if they had a reasonable doubt as to one

and not as to the other, but if they had a reasonable doubt as to the guilt of both, they should acquit both. While the form of the instruction may be somewhat unhappy, we think there can be no doubt that it secured to the defendants the full benefit of the presumption of innocence and required the guilt of each to be established beyond a reasonable doubt. It follows that the court did not err in refusing the instructions asked by the defendants, which stated the same legal propositions.

III. The defendant Ameleck Brooks testified in his own behalf, and at the close of the evidence on behalf of the defendants, the State offered in evidence the record of the circuit court of Iron county, in the case of the State of Missouri v. Ameleck Brooks, whereby it appeared that on the 28th day of April, 1900, the said defendant had been sentenced to the penitentiary of this State for a term of three years for manslaughter in the fourth degree. To the admission of this record in evidence, the defendants at the time objected on the ground that it could not be introduced to affect the credibility of the witness. The prosecuting attorney at the time stated that he offered the record of conviction for the sole purpose of affecting the credibility of the defendant Ameleck Brooks. The court admitted the record and the defendants excepted to the ruling of the court. This action of the court is now assigned as reversible error. It should be remarked in this connection that in the eighth instruction the court advised the jury that they were to consider the record of conviction of Ameleck Brooks solely as affecting the credibility of said defendant. Section 4680, Revised Statutes 1899, provides: "Any person who has been convicted of a criminal offense is, notwithstanding, a competent witness; but the conviction may be proved to affect his credibility, either by the record or by his own cross-examination, upon which he must answer any

question relative to that inquiry, and the party cross-examining shall not be concluded by his answer.'' This section came before us for review in State v. Blitz, 171 Mo. l. c. 540, et seq. The construction placed upon that section in the last-mentioned case has been followed in State v. Thornhill, 174 Mo. 364; State v. Woodward, 191 Mo. 633, 634, and State v. Spivey, 191 Mo. l. c. 111, 112; and we see no reason for disturbing the rule announced in those cases. Nothing said in State v. Beckner, 194 Mo. 281, is in conflict with any of the foregoing decisions on this subject; it must be held, therefore, that the court did not err in admitting the record of the defendant Ameleck's conviction at the time and for the purpose for which it was allowed.

IV. It is next insisted that the remarks of counsel for the State, in his argument to the jury, were utterly unwarranted and should work a reversal of the judgment. As to this assignment it may be said that there was a sharp issue made as to whether the counsel made the remarks attributed to him. But, whatever the fact, it must be held that the propriety or impropriety of his remarks are not before us for review. It is clear that the bill of exceptions does not show that the remarks were made, and that the defendants objected to them at the time, and that their objections were overruled by the court, and that defendants saved their exceptions at the time. It has been so often ruled that matters of this kind cannot be shown by affidavits that it is unnecessary to cite authorities on that proposition. [State v. McCarver, 194 Mo. l. c. 740; State v. Meals, 184 Mo. l. c. 260.]

We have examined all the errors assigned by the defendants, and in our opinion they furnish no ground for reversal and we have been unable to discover any other substantial error in the record.

The case was one peculiarly for the determination of the jury. If the jury had believed the testimony on

behalf of the defendants, they might well have found that the defendants were acting upon the defensive and that the defendant John Brooks, who killed the deceased Clemonds, did so under reasonable apprehension that the deceased was about to kill him, or inflict some great bodily harm upon him. On the other hand, if the jury believed, as they evidently did believe, that the defendant John Brooks killed the deceased by shooting him with a shotgun and that Ameleck Brooks. was present, aiding, abetting and inciting his brother John Brooks to kill and murder the deceased, and that at the time the deceased had taken no part in the difficulty between Ameleck Brooks and Gus Mead, and that deceased only appeared upon the scene after hearing his name called, and simply walked around the corner of the saloon to the scene of the difficulty between Mead and Ameleck, and immediately after turning the corner, saw the defendant John Brooks with a shotgun in his hands and without making any effort to shoot either John Brooks or his brother Ameleck, turned as if to go back to the south side of the saloon, and, as he turned, was shot by the defendant, John Brooks, from the effects of which he died, then the evidence established a case of deliberate, premeditated and unprovoked murder. It was for the jury to weigh this discrepant testimony, and there was ample evidence to support the conclusion which they reached. The evidence for the State tended to show that deceased was in no manner connected with the difficulty between Mead and Ameleck Brooks, and that he did not fire the pistol shot which wounded Ameleck Brooks. The physical facts testified to by the witnesses for the State as to the wounds in the back of the deceased, and the fact that his pistol was found in his pocket after the shooting, tended strongly to corroborate the evidence of the other witnesses for the State, that the deceased had given no provocation either just or lawful to justify either of the defendants in shooting and killing him.

But as already said, the question was one of fact for the jury under the instructions of the court, and we find nothing in the record which would justify this court in interfering with the verdict.

The judgment of the circuit court is affirmed, and the sentence which the law pronounces is directed to be carried into execution.

*Fox, P. J.,* and *Burgess, J.,* concur.