STATE ex rel. JOHN SMITH and MELVIN SHER-
MAN, Appellants, v. C. W. DYKEMAN et al., Re-
spondents.

Springfield Court of Appeals, February 6, 1911.

1. **CERTIORARI: Purpose of Writ: Jurisdiction.** The office
of the writ of certiorari is to give relief to an injured party
when the court or body charged to have acted to his injury
has proceeded without jurisdiction, or has exceeded its juris-
diction, or has rendered a judgment or made an order which
it was not authorized by law to make.

2. ———: ———: **Appeal and Error.** A writ of certiorari can-
not be used as a substitute for appeal or writ of error.

3. **DRAMSHOPS: Revoking License: Authority of County Court:
Certiorari.** A county court revoked the dramshop license of
relators for keeping a disorderly house in violation of section
3012, Revised Statutes 1899. This order was sought to be re-
voked by certiorari proceedings in the circuit court and upon
failing these relators appealed to the appellate court. *Held*,
that on such appeal only the certified record could be examined
and it appearing by a fair construction thereof that the county
court acted within its authority in revoking the license the
order must stand.

4. ———: ———: **Disorderly House: Selling Liquor on Sun-
day.** Selling liquor on Sunday on one occasion is not, standing
alone, sufficient to authorize a county court to revoke a dram-
shop keeper's license on the grounds that he kept a disorderly
house.

5. ———: ———: ———: **Bawdy House Above Dramshop.**
Where dramshop keepers rented the room above their saloon
to be used as a bawdy house, and said room was connected
with the saloon by a dumb waiter for conveying liquor to the
inmates and frequenters of the house, *held*, that the county
court was justified in finding that the dramshop keepers were
guilty of keeping a disorderly house in violation of section
3012, Revised Statutes 1899.

6. **LICENSES: Dramshop License: Not a Contract: Police
Power.** A license to sell liquor is in no sense a contract with
the state, but a mere permit to do an act that would otherwise
be unlawful and is subject at all times to the police power of
the state.

7. **WORDS AND PHRASES:** "Disorderly House:" Bawdy House. To constitute a disorderly house there must be a continuation of the acts for a short time at least, and such acts must tend to promote disturbances or breaches of the peace or violation of the law or must promote immorality. A bawdy house is a disorderly house per se and its maintenance is forbidden by statute.

8. **COUNTY COURT:** Jurisdiction: Revoking Dramshop License: General Finding: Certiorari. In a proceeding before a county court to revoke a dramshop keeper's license on the grounds that he conducted a disorderly house, a general finding that he conducted a disorderly house is sufficient, and where the specific findings upon which it is based are set out in the record of the county court and such specific findings are not inconsistent with the general finding, the general finding will not be disturbed in a certiorari proceeding.

Appeal from Jasper Circuit Court.—*Hon. David E. Blair*, Judge.

AFFIRMED.

*Clay & Davis* for appellants.

(1) Certiorari is the only remedy available for reviewing the action of the County Court in revoking the dramshop license of relators. State ex rel. v. Lichta, 130 Mo. App. 284; State ex rel. v. Smith, 176 Mo. 90; State v. Kirk, 112 Mo. App. 447. (2) The acts complained of by petitioner and found by the county court to be true, did not constitute the dramshop of relators a disorderly house. 2 McClain Criminal Law, sec. 1137; Wharton Criminal Law (9 Ed.), sec. 1449; 1 Bishop Criminal Law (8 Ed.), sec. 1106; Commonwealth v. Besser, 30 S. W. 1012; Hawkins v. Lutton, 95 Wis. 492, 60 Am. St. Rep. 131; Price v. State, 96 Ala. 1, 11 So. Rep. 128, 7 Atl. 340.

*Byron H. Coon* and *W. N. Andrews* for respondents.

COX, J.—Relators were licensed dramshop keepers in the city of Joplin, and on July 19, 1910, the county court, after a hearing upon a complaint filed. by Guy T. Humes, mayor of the city of Joplin, revoked the dramshop license of relators. The relators then proceeded by certiorari in the circuit court for the purpose of having the orders of the county court revoking their license quashed and set aside. The circuit court refused to quash the proceedings of the county court and the relators have appealed to this court.

The office of a writ of certiorari is to give relief to an injured party when the court, or a body charged to have acted to his injury, has proceeded without jurisdiction, or has exceeded its jurisdiction, or has rendered a judgment, or made an order which it was not authorized by law to make, but this writ cannot be used as a substitute for appeal, or writ of error. [State ex rel. v. Reynolds, 190 Mo. 578, 588, 89 S. W. 877, and cases there cited.] It, therefore, follows that we can only examine the records certified to us, and if, by a fair construction thereof, it shall appear that the county court acted within its authority in revoking the license of relators in this case their order must stand, and if not, it must fall.

A license to sell liquor is in no sense a contract with the state, but is a mere permit to do an act that would otherwise be unlawful, and is subject at all times to the police powers of the state government. The party receiving such a license takes it subject to all the provisions of the law relating thereto, and knows when he secures the license that it may be revoked at any time for the cause mentioned in the statute. The power to revoke in this case is lodged with the county court, and the statute, merely provides that if the licensee shall not at all times keep an orderly house the coun-

ty court may, upon the application of any person, revoke the license. No form of procedure is provided except that five days' notice of the hearing must be given the accused. In the hearing the county court merely conducts an investigation for the purpose of satisfying their own judgment as to whether or not the licensee has kept a disorderly house and are in no sense conducting a judicial trial. [Higgins v. Talty, 157 Mo. 280, 57 S. W. 724.] The proceedings, therefore, are not required to be as formal and exact as' would be the case in a judicial trial involving interference with life, liberty, or property. [Barnett v. County Court, 111 Mo. App. 688, 703, 86 S. W. 575.] All that is required is that the record shall show that the court acted within its authority. Whether the county court did so act in this case must depend upon whether or not the facts found by the court, by a fair construction, show that relators kept a disorderly house.

The record recites that relators were served with notice five days before the hearing, but neither appeared. The court heard the testimony and made the following finding:

"1st. That the said John Smith and Melvin Sherman have violated the law in selling intoxicating liquors on the first day of the week, commonly called Sunday, to-wit, the .... day of June, 1910."

"2d. That said dramshop operated by John Smith and Melvin Sherman was connected and has been for a long period of time by a dumb waiter running from the dramshop on the first floor to the second floor of said building, and that said dumb waiter is and was used for the purpose of sending up intoxicating drinks of all characters to the inmates and visitors in said rooms above said dramshop."

"3d. That said John Smith and Melvin Sherman have been and are renting the second floor of the said building in which said dramshop is located to Ray Sheldon for the purpose of operating and conducting therein

a house of prostitution, and that the same woman is living above said saloon now that has lived there for the past several months, and that the reputation of said woman for virtue and chastity is bad; and that. there are several women who live and occupy rooms on the said second floor at this date and have lived there for a long period of time and that divers men congregate in said rooms above said saloon and that whiskey and beer are sent up into said rooms with the knowledge and consent of the said John Smith and Melvin Sherman by the use of the said dumb waiter."

"And it appearing to the court that in all things said, the matter having been fully considered, the said John Smith and Melvin Sherman have been guilty of violating section 3012, Revised Statutes of Missouri of 1899."

Following this finding is the order revoking the license.

The fact that relators had on one occasion violated the law by selling liquor on Sunday is not shown to have any connection with the other facts found, and it may, therefore, be eliminated, as it, standing alone, is not sufficient. [State ex rel. v. Lichta, 130 Mo. App. 284, 109 S. W. 825.] The other facts found are all connected and must be considered together. Do they show that relators kept a disorderly house?

Our statute does not define a disorderly house and we must, therefore, look to the common law for a definition of the term. It has been variously defined. Wharton defines it to be a house kept in such a way as to disturb, annoy or scandalize the public generally, or the inhabitants of a particular vicinity, or the passers in a particular highway. This definition is quoted approvingly in State ex rel. v. Lichta, 130 Mo. App. 284, 109 S. W. 825, and in Hawkins v. Luttton (Wis.), 70 N. W. 483. In Price v. State (Ala.), 11 So. 128, the court, in defining the offense of keeping a disorderly house, says, "It is enough that the acts done

at such house are of the character charged and contrary to law and subversive of public morals." In Thatcher v. State (Ark.), 2 So. 343, this language is used. "A disturbance of the peace is not necessary. A house may. be disorderly because it draws together idle, vicious, dissolute or immoral persons who engage in unlawful or immoral practices, thereby endangering the public peace and promoting immorality. It has been said that "if the doors of a house are practically open to the public, alluring the young and unwary into it to indulge in or witness anything corrupting to their virtue or general good morals, the keeper cannot excuse himself by alleging that the public are not disturbed." Citing 1 Bishop's Criminal Law, 6th Edition, sections 1107 to 1120, and Wharton's Criminal Law, 9th Edition, sections 1449 to 1456; State v. Williams, 30 N. J. Law 104; Commonwealth v. Cobb, 120 Mass. 356. In Commonwealth v. Bessler (Ky.), 30 S. W. 1012 this language is used. "The offense of keeping a disorderly house consists of a repetition of improper conduct." In Commonwealth v. Goodall (Mass.), 43 N. E. 520 it is said, "The common law offense of keeping a disorderly house may be proved in various ways— by showing that the accused kept a common bawdy house, a common gambling house, or a disorderly place of entertainment."

It will be seen at once that it would be very difficult to frame a definition of the term "disorderly house" that would fit the facts in every case, but there are some elements that seem to be essential in all cases. One is that a single act is not enough, but there must be a continuation of the acts for a short time at least. Another is that the continued acts must either create some disturbance or must tend to promote disturbances or breaches of the peace, or violations of the law, or must promote immorality. Applying these tests to the case at bar what have we? Relators are operating a

saloon in a two-story building of which they have entire control. The room immediately over the saloon is rented by them to another party for the purpose of having a bawdy house conducted therein, and they then provide or maintain an elevator or "dumb waiter" that is used for the purpose of conveying liquor from the saloon to the inmates and frequenters of the bawdy house above. The bawdy house was a disorderly house *per se*, and its maintenance forbidden by our statute. The relators, by renting the room over their saloon to be used as a house of prostitution, were *particeps criminis* in maintaining it. [State v. McClain, 92 Mo. App. 456; Coon v. State (Ala.), 20 So. 380; State v. Engeman (N. J.), 23 Atl. 676; Commonwealth v. Cobb, 120 Mass. 356.] In legal contemplation, therefore, and for the purposes of the investigation conducted by the county court in this case, the relators' position is the same as if they had run the house of prostitution themselves.

If the saloon and the bawdy house operated in conjunction so that either assisted the other they should both be considered as parts of a general business, and though one be located on the first floor and the other on the second floor they should both be regarded as parts of the same house, and what transpired in both the upper and lower rooms should be considered in determining the character of the house kept in either room. [State v. Lee (Iowa), 45 N. W. 545.]

It is a matter of common knowledge that frequenters of a bawdy house are usually patrons of saloons also, and when these relators established a bawdy house over their saloon and maintained an elevator for the purpose of conveying liquor from the saloon to the inmates and frequenters of the bawdy house above, it is but fair to assume that their purpose in locating the bawdy house in such close proximity to the saloon and connecting the two as they did was to increase the sales from the saloon, and this necessarily made the relators

interested in the patronage of the bawdy house as they were interested in the patronage of the saloon; hence, the bawdy house became an adjunct of the saloon and the fact that the two had been maintained in this way for several months by relators would cause the saloon as well as the bawdy house to become a public scandal and a continual promoter of immorality, and is thus brought within the common law definition of a disorderly house. The inference that the place, including the saloon, had become notoriously offensive gained some strength from the fact that the mayor of the city filed the complaint against the relators in this case.

The court, in its finding, does not set out specifically that the saloon had become a public scandal, but the facts which it did find show that such must have been a necessary result, and these specific findings are followed by a general one that relators had violated section, 3012, Revised Statutes 1899, which statute makes it unlawful for a dramshop keeper to keep a disorderly house. It was not necessary that the court should have made any specific finding of facts. A general finding that relators were conducting a disorderly house would have been sufficient, and since this general finding was made it must stand unless the specific findings upon which it is based contradict it, or are insufficient to support it. In our judgment the specific findings in this case support the general one and the record is sufficient to show the authority of the county court to make the order revoking relators' license, and the trial court rightly so held. The judgment will be affirmed. All concur.