STATE OF IOWA v. BARNEY GILL AND MAY GILL, Appellants.

**Criminal law:** DISORDERLY HOUSE: COERCION OF WIFE: PRESUMPTION.
1 The presumption that a crime committed by the wife in the presence of her husband was the result of his coercion does not obtain, where they are jointly charged with keeping a disorderly house.

**Same:** DISORDERLY HOUSE: ELEMENTS OF OFFENCE. It is not essential
2 to conviction for keeping a house of ill fame that it be found that persons frequenting the place are of licentious inclinations; it is sufficient if frequented for an immoral purpose.

**Same.** Although acts of illicit intercourse only with a woman who
3 is proprietor of the house will not constitute the place a house of ill fame, yet where the husband is proprietor of the house, even though the wife participate in its government, her acts of intercourse therein with other men will constitute the place a house of ill fame, and authorize conviction of the husband for keeping it and of her for aiding him therein.

**Same:** EVIDENCE. Evidence reviewed and held sufficient to author-
4 ize conviction for keeping a house of ill fame.

*Appeal from Mahaska District Court.*—HON. W. C. CLEMENTS, Judge.

FRIDAY, FEBRUARY 10, 1911.

THE defendants were convicted of keeping a house of ill fame, and they appeal. *Affirmed.*

*C. Ver Ploeg,* for appellants.

*H. W. Byers,* Attorney-General, and *C. W. Lyon,* Assistant Attorney-General, for the State.

LADD, J.—I. The defendants were jointly indicted, and, as they are husband and wife, counsel argue that the presumption that what the latter did was by coercion of the husband, and for this reason she should have been acquitted. As to many offenses committed in the husband's presence, such is the rule. *State v. Harvey*, 130 Iowa, 394; *State v. Kelly*, 74 Iowa, 589; *State v. Fitzgerald*, 49 Iowa, 260. But this rule has no application to the crime of keeping a bawdyhouse or house of ill fame, "for this is an offense as to the government of the house in which the wife has the principal share, and also such an offense as may generally be presumed to be managed by the intrigue of her sex." 1 Hawk. P. C. C. section 12; *State v. Jones*, 53 W. Va. 613 (45 S. E. 916); *Com. v. Cheney*, 114 Mass. 281; *State v. Bentz*, 11 Mo. 27. See *Rex v. Dixon*, 10 Mod. 335.

1. CRIMINAL LAW: disorderly house: coercion of wife: presumption.

II. Complaint is made of the refusal by the court to instruct the jury that "in order to find the defendants guilty . . . you must find from the evidence that the men or persons frequenting said defendant's house were of ill repute, and were of licentious inclinations." Such a finding was not essential. If persons frequented such places for the purpose of indulging their sexual passions or some other lewd purpose, as the jury were told was necessary in order to convict, they must have had the "inclination" mentioned, and it was immaterial of what repute they were. Regrettable though it be, persons of good repute are sometimes found at such places, but this extenuates in no manner the crime of their maintenance. The instruction was rightly refused.

2. SAME: disorderly house: elements of offense.

III. Another instruction was requested and refused. This directed an acquittal unless "more than one act of illicit sexual intercourse took place in defendant's house, and that such acts of sexual intercourse must have been

with others than the defendant.   Any number of acts with

<span style="float:left">3. SAME.</span> defendant alone would not make the place a house of ill fame.   Therefore, if you find from the evidence that defendant's house was resorted to by men for the purpose of illicit intercourse with the defendant May Gill, but you do not find that said acts of sexual intercourse were with another person except said May Gill, then you should acquit."   Of course, a single act of illicit intercourse in a place will not alone constitute it a house of ill fame, nor at the common law did any number of incontinent acts by the proprietor with one or many persons. A bawdyhouse was defined as "a house of ill fame, kept for the resort and convenience of lewd people of both sexes," and it was said in *State v. Evans,* 27 N. C. 603, that "the residence of an unchaste woman—a single prostitute—does not become a bawdyhouse, because she may habitually admit one or many men to an illicit cohabitation with her.   The common law did not undertake the correction of morals in such cases, but left the parties to spiritual supervision and penances. . . .   A bawdyhouse is not the habitation of one lewd woman, but the common habitation of prostitutes—a brothel.   That such is the just notion of this offense is very clear from *Pierson's case,* 1 Salk. 382, 2 Lord Raym. 1197.   It was there held that an indictment will not lie for being a bawd and unlawfully procuring evil-disposed men and women to meet and commit whoredom and fornication, for it is but a solicitation of chastity, and, like a want of chastity in any individual, was a spiritual offense; and the indictment should have been for keeping a common bawdyhouse which is there described as an offense committed by one, who has a house or a room, and therewith accommodates lewd people to perpetrate acts of uncleanness—plainly meaning, acts between the persons thus entertained."   And such is the view of the law entertained in other decisions.   *People v. Buchanan,* 1 Idaho, 681; *Moore v. State,* 4 Tex. App. 127;

*State v. Calley,* 104 N. C. 858 (10 S. E. 455, 17 Am. St. Rep. 704); Bishop's New Criminal Law, section 1085. And an instruction so stating seems to have been approved in *State. v. Lee,* 80 Iowa, 75. In *People v. Mallette,* 79 Mich. 600 (44 N. W. 962), a different opinion was expressed though without discussion or citation. Whether such is the law in view of language of the statute and the more recent decision, need not now be determined, for the facts of this case do not bring it within the rule as contended for. The defendants lived· together, and the husband in permitting his wife to turn the house into a place of prostitution became equally guilty with her. As he was proprietor of the place, even though his wife may have participated in its government, any acts of incontinence with her were not with the proprietor, and therefore might constitute the place a bawdyhouse, even though never frequented by other women. *State v. Young,* 96 Iowa, 262. And she may have been found to have aided him in keeping the same. As the instruction was otherwise, it was rightly refused.

IV. The sufficiency of the evidence to sustain the verdict is challenged. Several witnesses testified to seeing men going to and from the house through the back as well **4. SAME: evidence.** as front door at all times of the day and up to twelve o'clock at night when the husband was absent as well as at home. These were described as dirty-looking men. One witness thought from their appearance that most of them had been drinking, and another testified that one of them was drunk on leaving. The chief of police testified that the place was reputed a house of ill fame, but based this conclusion upon what the above witnesses had said. None of them testified to having heard it so denominated since defendants had occupied the premises, but declared that the house had previously borne such reputation. May Gill had lived with the other defendant several years before marrying him, and there was evidence

that she was often in the saloons, and that her general
moral character was bad, and this was somewhat confirmed
by the story of Ruth Edson, a child of fourteen years, who
admitted to having entertained improper relations with
several men.  She testified to having become acquainted
with May Gill at a store where a couple of men arranged
to meet them at a specified place on the street from which
to accompany them to their room, and that they eluded
these males by taking another route; that she had called
at defendant's house to take orders for perfumery, and
while there drank beer with them and one Beadle; that
she sat on the bed, which was in the kitchen, where May
Gill was ironing, with Beadle, with whom she had worked
the summer previous, and that he hugged and kissed her,
and proposed, though not in the hearing of defendants,
that she go to bed with him; that Gill, his wife having left,
ordered Beadle from the house and told him not to return,
remarking that he had never· paid May any money for
coming down there, and eating off them; that she left at
the same time Beadle did, but returned the next day for
the order book she had forgotten, when Darner was there,
and again all drank beer.  After she had been there nearly
two hours they suspicioned something was wrong, when Gill
told her she had better leave.  Darner departed with her,
but May Gill went another way, and all eluded the police
temporarily.  According to her story, Gill offered her
money on each visit if she would let him have intercourse
with her, but she refused, and May Gill explained that he
would not have talked that way were he not drunk.  And
May Gill told her of keeping a house at Ottumwa ˙where
the girls turned over half price to her, and that if the
witness brought men there she would have to do the same,
and confided to her that she was earning $10 or $15 a
day; also, upon leaving the house, said she must go out
to make $10.  It appeared that defendants habitually con-
sumed large quantities of beer; that during the warm por-

tions of the year he traveled over the country with a horse trading outfit, his wife accompanying him, and that during the winter preceding his arrest he had worked but a few days. Such is the record, and, as we think, it amply supports the verdict. The jury could well have found that May Gill was an immoral woman, and, having done so, this, with the testimony of Ruth Edson, explained the occasion for the stream of male visitors at her home. The state is not required to produce direct testimony of acts of prostitution or lewdness within the house. Having established the keeping of the house, and that it is resorted to, the purpose of resorting thereto is ordinarily a matter of inference from circumstances proven, such as the reputation of the place and those frequenting it. *State v. Burns*, 145 Iowa, 588. Whether orderly or not, the character of the inmates as well as those visiting the house evidence solicitations, admissions, and the like. The evidence was such that the jury might have found defendants guilty of the crime denounced by the statute.

V. In the fourth instruction the court defined a house of ill fame as one "visited or frequented by persons of both sexes for the purpose of having sexual intercourse or some other lewd purpose," and it is said that there is no showing that any female other than May Gill had frequented the place. As pointed out in *State v. Young, supra*, it was not essential that any female other than May Gill frequent the house, and, in view of the evidence, this instruction may be construed as having reference to frequenting it by her and her male callers. But if this were not so, Ruth Edson visited it three times in two days, and, though ostensibly to dispose of perfumery, her story concerning their visits is quite susceptible of another explanation, which the jury might have adopted. The criticism of the fifth instruction is without foundation.

There was no error, and the judgment is *affirmed*.