THE STATE v. LOUIS HESSELMEYER and MARTHA HESSELMEYER, Appellants.—123 S. W. (2d) 90.

Division Two, December 20, 1938.

*James Booth* and *James L. Anding* for appellants.

*Roy McKittrick,* Attorney General, and *J. F. Allebach,* Assistant Attorney General, for respondent.

802

ELLISON, J.—The appellants, husband and wife, were convicted of displaying signs of an honest occupation and business upon the exterior parts of a house in Franklin County then and there ordinarily used as a common assignation and bawdyhouse, whereby decent persons might be inveigled thereinto, in violation of Section 4295, Revised Statutes 1929 (Mo. Stat. Ann., p. 2992). Their punishment was assessed by a jury at two years' imprisonment in the penitentiary. On this appeal they challenge the sufficiency of the information and evidence, and complain of the admission of improper testimony and the giving of erroneous instructions at the request of the State.

Regarding the sufficiency of the information. Appellants contend it is fatally defective in that it does not designate with particularity the house or building on which the alleged signs were displayed. It alleges that appellants were "in charge of a house and building, to-wit: a one story frame restaurant, tavern and kitchen consisting of a bar room, kitchen and living room and bedroom, and one cabin, commonly known as a tourist cabin . . . said house and building then and there being ordinarily used as a common assignation and bawdyhouse." Then follows a charge that the appellants displayed the aforesaid signs "upon the outer walls, window and roof of said building." The complaint made is that since *two* buildings are described, a three room tavern building and a cabin, the foregoing allegations do not make it plain whether the signs were on the tavern or the cabin.

We think there is no substance in this assignment and overrule it. This part of the information is poorly drawn but the evident intent was to designate the cabin merely as a cabin, and the tavern as the "house or building." The evidence showed the signs were on the

latter; the appellants lived in it; and they did not challenge the information at the trial. It strains credulity to say they were misled. The two cases cited by appellants are easily distinguishable. In State v. McLaughlin, 160 Mo. 33, 40, 60 S. W. 1075, 1076, the indictment failed even to give the location of the building involved except to say it was in the county. In State v. Malloch, 269 Mo. 235, 239, 190 S. W. 266, 267, another building not mentioned in the information was operated in connection with the one charged and evidence was admitted showing acts of illicit sexual intercourse in the *former*.

Five assignments of error in appellants' brief charge that the evidence was insufficient to support the verdict and judgment. These are based on the proposition that the State failed to establish the tavern was used as a common assignation or bawdyhouse—this because only two acts of bawdry were proven, and because the evidence showed only one female inmate in the house. On this point we must review the evidence briefly. The trial occurred in November, 1937. Appellants had been operating Bourboise River Inn since January of that year. The tavern building faced north upon U. S. Highway No. 50, just east of Union in Franklin County. It was a square or rectangular one story building with the public or bar room across the front end and a small kitchen and combination living and bedroom behind it. A door led from the bar room to the kitchen, another from the kitchen to the bedroom, and still another from the kitchen to the back yard. There was a privy in an outbuilding behind the tavern and in going thereto customers sometimes would pass through the kitchen. Also they could wash and dry their hands and drink water in the kitchen. The cabin mentioned in the information does not figure prominently in the testimony. Beer, soft drinks and sandwiches were sold in the tavern. There was an electric phonograph in the public room and dancing was permitted. On the end of the building was a sign "Louis Hesselmeyer Place, Falstaff Beer." At the side of the entrance door was a "7 Up" soda sign. Over the door and, as we understand the record, attached to the roof or eaves was a sign "Bourboise River Inn."

For the State one witness, Thompson, testified that on a certain occasion (which other testimony indicates was in August) when he was at the Inn the appellant Louis Hesselmeyer told him his wife, the appellant Martha Hesselmeyer, wanted to see him (the witness) and showed him the way to the bedroom. There he paid her one dollar and had sexual intercourse with her. About a month later he returned to the Inn with a man named Pope. That time there was an argument or fight between some other men, outside the building. Pope testified to this and also said that on that occasion Thompson proposed going over to U. S. Highway No. 66, apparently on some

amorous quest. The appellant Louis Hesselmeyer spoke up and said "you can get anything you want here." Mrs. Hesselmeyer was in the other room at the time.

Witness Russell testified that one morning about the first week in June he was talking to appellant Louis Hesselmeyer about women and the latter said "Right here is as good a place as any." The witness gave Hesselmeyer 75 cents and was directed by the latter to the bedroom where he had sexual intercourse with Mrs. Hesselmeyer. He returned late that afternoon and repeated the act. The same day he saw a salesman give Mr. Hesselmeyer $1 but didn't hear any conversation between them. The witness Russell was a frequenter of the place having been there about twenty times during the summer. He never noticed any woman staying at the Inn other than Mrs. Hesselmeyer except Mr. Hesselmeyer's daughter, and he saw her there only one time. Good order prevailed on that occasion as well as on perhaps three-fourths of his visits.

Nevertheless he had seen "lots of men" there at various times. Some were in the public room and some would go back into the kitchen from which a door led into the bedroom, but they might have gone out the back door instead of into the bedroom. Sometimes Mrs. Hesselmeyer would be in the public room and sometimes not. Another witness, Bullock, several times had seen men go from the public room into the kitchen, but he didn't know where they went from there. Mrs. Hesselmeyer was not always in the public room when this occurred, but whether she preceded or followed the men into the back room the witness "couldn't say for sure." Some of the people present on such occasions were people of good character.

Alvin Diestelkamp, city marshal of Union and deputy sheriff of Franklin County, testified he had been called to Bourboise River Inn three or four times because of noises, cursing and fighting there. Over objection he said the general reputation of the general class of people that frequented the place was bad, and that both appellants had the reputation of running a bawdyhouse at the Bourboise River Inn. On cross-examination he stated he had had a lot of complaints from citizens because the Inn was "a joint of that kind;" and that witnesses Thompson and Pope had told him of a fight which occurred there when Louis Hesselmeyer attempted to kill them with a shotgun and knocked his wife down and beat her up. John Geibler, sheriff, testified that both Mr. and Mrs. Hesselmeyer had the reputation of keeping a bawdyhouse. On cross-examination appellants' counsel elicited testimony that the reputation of some of the men who visited the place was good, and as to others not good.

The appellants Louis Hesselmeyer and Martha Hesselmeyer were sixty-one and forty-seven years old respectively at the time of the

trial. Both testified and denied the incriminating evidence adduced by the State. In addition they presented the testimony of six witnesses that their general reputations for morality and chastity were good. Some of these witnesses said appellants did not run a bawdyhouse at Burboise River Inn so far as they had observed on frequent visits to the place.

Appellants contend this evidence did not make a prima facie case that Burboise River Inn was a common bawdyhouse, because there was proof of only two acts of bawdry, one in June in connection with the witness Russell, and another in August in which the witness Thompson figured; and the evidence showed there was only one female inmate, the appellant Martha Hesselmeyer. On these points the following cases are cited: State v. Seba (Mo. App.), 200 S. W. 300; State v. Calley (1889), 104 N. C. 858, 10 S. E. 455, 17 Am. St. Rep. 704; State v. Evans (1845), 27 N. C. 603; Commonwealth v. Lambert (1866), 94 Mass. 177; People v. Gastro (1889), 75 Mich. 127, 133, 42 N. W. 937; People v. Buchanan (1878), 1 Idaho, 681, 687-9; Hardaman v. State (1925), 100 Tex. Cr. App. 358, 273 S. W. 584; Woodson v. City of Ft. Smith (1924), 165 Ark. 443, 264 S. W. 934; People v. True (1925), 235 Ill. App. 349; State v. Pyles (1920), 86 W. Va. 636, 104 S. E. 100, 12 A. L. R. 527.

The Seba case, decided by the Kansas City Court of Appeals, defines a common bawdyhouse as ''a house resorted to and frequented by lewd people of both sexes.'' In State v. Keithley, 142 Mo. App. 417, 420, 127 S. W. 406, 407, the definition was ''a house kept for the purpose of prostitution, that is, for men and women to have unlawful, illicit sexual intercourse together therein;'' and in State v. Horn, 83 Mo. App. 47, 50, as ''a house of ill-fame, kept for the resort and commerce of lewd people of both sexes.'' The Calley case from North Carolina says a bawdyhouse is ''a habitation for prostitutes—a house of ill-fame kept as a place of common resort and convenience of lacivious and lewd people of both sexes.'' It may be conceded that the foregoing definitions are generally accepted in all jurisdictions in this country.

The point here stressed by appellants is that such places must be *frequented* or commonly resorted to for the illicit purposes aforesaid. The gist of the offense, says the Woodson case from Arkansas, is the drawing together of disorderly persons engaged in unlawful or immoral practices, thereby endangering the public peace and promoting immorality. And the Pyle case from West Virginia declares that at common law such houses must possess an element of danger to the public peace, and have a tendency to bring together crowds or assemblages of dissolute, debauched and quarrelsome persons. The common law penalty had for its principal purpose preservation of the

peace, not the maintenance of morality. The latter was left to the spiritual tribunals. On this point see also State ex rel. Smith v. Dykeman, 153 Mo. App. 416, 420, 134 S. W. 120, 122.

Hence the rule is established by the Seba case from this State and several of the others cited above that proof alone of one or even several illicit acts of sexual intercourse in a house will not make it a common bawdyhouse. Neither will the fact alone that a woman privately and singly admits to her home for that purpose from time to time one or more favored men. On the other hand, it is equally well established that if there be other evidence showing the public or indiscriminate nature of the unlawful sexual commerce, proof of a single illicit act will be sufficient. It is so held in the Seba case. Indeed, State v. Hoelcher, 163 Mo. App. 352, 354, 143 S. W. 850, 851, the Gastro case from Michigan and the Buchanan case from Idaho declare specific acts of bawdry in the house need not be shown. In the nature of things the evidence must be largely circumstantial. Among the facts that may be proven are: that lewd persons resort to or congregate at the house; prevalence of disorder; the reputation of the house and of the frequenters and inmates. [18 C. J., secs. 92-97, pp. 1266-8; 9 R. C. L., sec. 11, p. 225; State ex rel. Orr v. Kearns, 304 Mo. 685, 699, 264 S. W. 775, 778; State v. Froemsdorf (Mo. App.), 279 S. W. 181, 183; State v. Flick (Mo. App.), 198 S. W. 1134; People v. Buchanan, supra, 1 Idaho, 1. c. 688; People v. True, supra, 235 Ill. App. 349.]

But appellants contend that, everything else aside, the evidence failed to show Bourboise River Inn was a common bawdyhouse because the proof disclosed there was only one female inmate therein— the appellant Martha Hesselmeyer. They say that since our statutes do not define a common bawdyhouse we must look to the common law; and that under the common law it must appear the place was resorted to by more than one prostitute. This contention is supported by State v. Evans, supra, 27 N. C. 603; State v. Pyles, supra, 86 W. Va. 636, 104 S. E. 100, 12 A. L. R. 527, 529, annotation, and by several Canadian and English cases. The annotation acknowledges a contrary rule is enforced in many states, but expresses the view that it is influenced by statute. On the other hand, 18 Corpus Juris, section 21, page 1241, declares without qualification that the weight of authority makes no such requirement of a plurality of whoredom. In State v. Dudley, 56 Mo. App. 450, 452, only one woman was in the house. As we read the decisions there are several which hold the *common law* rule recognized one prostitute might make a place a bawdyhouse. [See People v. Buchanan, supra, 1 Idaho, 1. c. 689; Fisher v. Paragould, 127 Ark. 268, 192 S. W. 219; Gamewell v. State, 137 Ark. 74, 207 S. W. 211; People v. Slater, 119 Cal. 620, 51

Pac. 957; People v. Mallette, 79 Mich. 600, 44 N. W. 962.] Also it was held in State v. Young, 96 Iowa, 262, 65 N. W. 160, 59 Am. St. Rep. 371, that where a man and his wife maintained their home as a house of prostitution, no other female living at or resorting thereto, it was under the ban of the statute. To the same effect is State v. Gill, 150 Iowa, 210, 229 N. W. 821.

But even if the common law definition of a common bawdyhouse be as restricted as some of the above authorities indicate, we are convinced the legislative intent disclosed by our statutes is more inclusive. Section 4295, Revised Statutes 1929 (Mo. Stat. Ann., p. 2992), here involved, requires the building on which the signs are displayed to be "a common assignation house, or common bawdyhouse." Sections 4292 and 4296 (Mo. Stat. Ann., pp. 2991 and 2993), in their prohibitions use the same language. Section 4291 (Mo. Stat. Ann., p. 2989), forbids the keeping of a "common gaming house, or bawdy house or brothel or house of assignation." Sections 4297 and 4298 (Mo. Stat. Ann., p. 2993), are leveled at "a gaming house, brothel or bawdyhouse;" Section 4299 (Mo. Stat. Ann., p. 2994), at "a bawdy house, brothel or common gaming house;" and Section 4300 (Mo. Stat. Ann., p. 2994), denounces as a public nuisance "any bawdy house, assignation house, or place of prostitution." Thus it will be seen disorderly houses of various kinds are grouped together and treated alike. If, as the cases agree, the law denounces bawdyhouses because they endanger public peace and morals, and draw dissolute persons together, there is no reason for relaxing the rule when only one woman is in the house, for that may occur as much, or nearly as much, when a single woman is the siren.

Bourboise River Inn was a public place, resorted to by men and women, married and single, not all of whom were bad. But many times men alone congregated there, at least some of whom were of bad repute. The place was disorderly. Specific acts of illicit sexual intercourse for pay were shown on two occasions. Once the money was paid to the husband, Louis Hesselmeyer, once to the wife, Martha Hesselmeyer. Both times he directed the men to her. He told witness Thompson, "you can get anything you want here;" and said to witness Russell, "right here is as good a place as any." We think this evidence made a prima facie case that the house was a bawdyhouse.

The main question in our minds has been about the guilt of the wife. The aforesaid statements of the husband were made out of her presence and were not binding on her. But once she took the money. She assisted in the work of running the Inn but not very actively in that part which brought her in contact with men in the bar room. She stayed in the kitchen and bedroom most of the time

but she had nowhere else to go. There is no evidence that she was guilty of any enticements or solicitations. Once her husband knocked her down and beat her. So far as the testimony shows he took the lead in whatever sexual traffic occurred.

The language of the statute, Section 4295, supra, is that "every keeper or person in charge of any house or building at such time ordinarily used as a common assignation house, or common bawdyhouse, who shall expose or display, or cause to be exposed or displayed, or knowingly permit to be exposed or displayed," upon the exterior part of such house or building any sign of an honest occupation or business whereby any decent person may be inveigled thereinto, may be adjudged guilty of a felony. We cannot feel the State has proven Mrs. Hesselmeyer was the keeper or in charge of the Inn. Neither do we think the evidence shows she exposed or caused or permitted to be displayed the signs on the building, though she knew they were there. The gist of the offense is in displaying the signs. [State v. McLaughlin, supra, 160 Mo. 1. c. 40, 60 S. W. 1. c. 1076.] It is not necessary that she should have had anything to do with putting them up, State v. Griffin (Mo. Div. 2), 202 S. W. 542, 544; but she must have had some control over them. The main sign bore Louis Hesselmeyer's name. He was the person in charge. Furthermore we have the presumption, be it weak or strong, that the wife acted under the coercion of the husband. [State v. Bragg (Mo. App.), 220 Mo. App. 25, 27; State v. Hoelcher, supra, 163 Mo. App. 1. c. 355, 143 S. W. 1. c. 851; State v. Keithley, supra; 142 Mo. App. 1. c. 421, 127 S. W. 1. c. 407; 4 A. L. R. 277, note; 71 A. L. R. 1122, note.] Considering the evidence all together we think the State failed to make a case as to the wife, Martha Hesselmeyer.

Another group of assignments complains of the wrongful admission of testimony on reputation. Alvin Diestelkamp, city marshal and deputy sheriff, testified he was familiar with Bourboise River Inn, knew the two appellants, and was generally acquainted with the people around Union and those who frequented the Inn. He was then asked these questions and made these answers: "Q. Do you know the general reputation of the general class of people that frequent this place? A. I do of a lot of the people that were there, occasionally there were people there that I didn't know. Q. But do you know the general reputation of those that you knew?" The witness answered that he did and that their reputation was bad. Appellants assert this was error because "character evidence when admissible ought to be restricted to the trait of character which is in issue," citing such cases as: State v. Taylor, 293 Mo. 210, 217, 238 S. W. 489, 491; State v. Beckner, 194 Mo. 281, 292, 91 S. W. 892, 895, 3 L. R. A. (N. S.) 535; State v. Anslinger, 171 Mo. 600, 608-9, 71 S. W. 1041, 1043.

All these cases are directed to the admission of testimony showing the reputation of the *accused* in a criminal case, as bearing on the question of his guilt or innocence. But in this case the question concerned the character of the *house* as indicated by the reputation of the persons who frequented it. And on that point it is the rule in this and a number of other states that the general repute of the frequenters may be shown, 18 Corpus Juris, section 96, page 1268; State ex rel. Orr v. Kearns, supra, 304 Mo. l. c. 699, 264 S. W. l. c. 778; Clementine v. State, 14 Mo. 112, 114; State v. Froemsdorf, supra, 218 Mo. 481, 279 S. W. l. c. 183.

Some of the Missouri cases seem to support appellants' contention, as where proof of the reputation of the inmates and frequenters of an alleged bawdyhouse for *chastity* was admitted to show the character of the house: State v. Price, 115 Mo. App. 656, 658, 92 S. W. 174; State v. Horn, supra, 83 Mo. App. 47, 50, and where the reputation for gaming of the frequenters of a house was admitted to prove it was a gambling house, State v. Mosby, 53 Mo. App. 571, 576-7. But when it is remembered that bawdyhouses are denounced by the law mainly as vice centers endangering the public peace and morals and attracting dissolute persons of all kinds, we think it is proper to prove the general bad reputation of frequenters without limiting it to unchastity. Thus it is said in 18 Corpus Juris, section 94, page 1267, that "evidence of any facts tending to show that the house was disorderly, by reason of its being a bawdyhouse or house of ill fame is admissible." It is not questioned in the instant case that evidence of cursing, fighting and drunkenness at the Inn was competent. And in at least two Missouri cases the fact was shown that liquor was sold: State ex rel. Smith v. Dykeman, 153 Mo. App. 416, 422, 134 S. W. 120, 122; State v. Dudley, 56 Mo. App. 450, 452, supra. We rule this assignment against appellants.

Further complaint is made that two witnesses were permitted to testify to the bad reputation of the appellants as bawdyhouse keepers without first requiring the witnesses to state they knew the *general* reputation of appellants in that respect, citing State v. King, 78 Mo. 555, 556. These two witnesses were Alvin Diestelkamp, city marshal and deputy sheriff, and John Giebler, sheriff. With reference to Diestelkamp the prosecuting attorney had proven by the witness that he was acquainted with the people around Union generally; that he was also acquainted generally with the people with whom the appellant Louis Hesselmeyer associated. On cross-examination the witness said he understood "reputation is what people say about a man," a definition which appellants' counsel accepted as correct. These questions followed on redirect examination:

"Will you state, Mr. Diestelkamp, whether or not—I will ask you, Mr. Diestelkamp, do you know the reputation of Mrs. Hesselmeyer

as to whether or not she is running a bawdyhouse at Bourboise River Inn?

"Mr. BOOTH: That is objected to as incompetent, irrelevant and immaterial, and because it invades—it involves a trait of character that is involved in the trial of this cause. (Overruled and exceptions saved.) A. Yes, sir.

"Q. What is that reputation? A. Well, she has a reputation of running a bawdyhouse.

"Mr. POLITTE: I will ask you if Mr. Louis Hesselmeyer, whether or not he has a reputation of running a bawdyhouse? A. He does.

"Mr. BOOTH: One moment, now, Your Honor, that question as to what Mr. Hesselmeyer has a reputation for doing, I object to it on the ground it is not properly framed, it isn't the general reputation, and I move to strike out the answer for that reason." (Overruled and exceptions saved.)

It will be observed that the objection now made was not interposed in the trial court, as regards the reputation of Mrs. Hesselmeyer, and since we have held the evidence was insufficient to convict her the error was harmless so far as she is concerned, anyway. With respect to Mr. Hesselmeyer, the question was answered before the objection was made and a preceding similar question was asked without challenge on that ground. Furthermore the whole context shows the reputation inquired about was general reputation based on what the people of the community said. The facts are wholly unlike those in the King case cited by appellants.

Sheriff Giebler testified he knew the people around Union, in that section of Franklin County. He was then asked if he knew "the reputation of Mrs. Hesselmeyer as to whether or not she is operating a bawdyhouse, among the people in this community." On objection that the question was "not framed properly" it was overruled. Then, interspersed with dialogue, the question was repeated, the time being fixed in August, 1937, but without including the phrase, "among the people in this community;" and objection was made that the question "doesn't call for the *general* reputation." It was overruled and the question asked again as follows: "State whether or not Mrs. Hesselmeyer had a reputation of being a bawdyhouse operator?" This time the question specified no date, and did not include the phrase "among the people in this community" and it was answered in the affirmative. But it was evidently intended and understood to mean reputation among the people of the community in August, 1937. We think there was no substantial error in permitting the answer to stand.

Appellants complain of Instruction C, given at the request of the State, which was as follows:

"You are further instructed that in order to convict the defendant it is not necessary that you find that any decent person was actually deceived or inveigled into such bawdyhouse or assignation house, if any, but it is sufficient if you find that a decent person may have been deceived or inveigled into such house so ordinarily used as a common bawdyhouse or common assignation house; if it was so used."

The complaint is that the instruction is vague, indefinite and misleading, and does not include all the facts necessary to constitute the offense charged. Appellants' theory seems to be that the instruction authorizes a verdict without defining a common bawdyhouse and common assignation house and without requiring the jury to find that a sign of an honest business was displayed thereon whereby a decent person might be inveigled therein. But we do not regard the instruction as one authorizing a verdict. The State's general instruction was Instruction F. It did define a common bawdyhouse and a common assignation house and require a finding that such signs were displayed on the house. Instruction C was confined to one issue. It told the jury they need not find any decent person actually was inveigled into the house, but only that such might have been. This court so declared the law in State v. McLaughlin, supra, 160 Mo. l. c. 40, 60 S. W. l. c. 1076, and State v. Olds, 217 Mo. 305, 313, 116 S. W. 1080, 1082. It is true the instruction does not say that such inveigling may have been accomplished *by the signs* but when read with the other instructions it can mean nothing else. Instruction C is not a model, but we hold there was no reversible error in it.

Similar complaint is made of Instruction D, which follows: "You are further instructed that it is not necessary, in order to convict the defendants, that they should have set up and maintained said building for the sole use of a common assignation house or a common bawdyhouse. It is sufficient that defendants set it up and maintained it for common uses as an assignation house or bawdyhouse, if you so find, and it may be also used in part at the same time for legitimate and lawful purposes."

Appellants say this instruction declared an abstract proposition of law without application to any fact in issue; that it read as if the charge was *keeping* a bawdyhouse instead of displaying the sign of an honest business upon a house ordinarily used as a common bawdyhouse. Again we say, this instruction was not a general instruction authorizing a verdict it was limited to one issue. The evidence had shown the front room of the Inn was used for the sale of beer, soft drinks and sandwiches, a lawful business. The instruction in effect told the jury the fact that this business was carried on in connection with bawdry would not prevent a conviction, if they found the house was maintained for common use as a bawdyhouse. We find no merit in the assignment. An instruction, No. 5 of similar import was given

in State v. McLaughlin, supra, 160 Mo. 1. c. 38, 60 S. W. 1. c. 1076. ██ Finally, appellants attack the State's Instruction F, which was as follows:

"The Court instructs the jury that all persons are equally guilty who act together with a common intent and purpose in the commission of a crime, and the crime so committed by two or more persons jointly is the act of all and each so acting.

"If you find and believe from the evidence that at any time within three years prior to the filing of the information in this case, the defendants, and each acting alone or together, or either of them at the place mentioned in the evidence were the keepers or persons in charge of a certain house and that said house was at the time ordinarily used as a common assignation house or common bawdyhouse, if you so find, and if you find that defendants had knowledge that said house was so used as a common assignation house or common bawdyhouse, if you so find, and that said defendants did expose or display, or cause to be exposed or displayed, or knowingly permit to be exposed or displayed upon the outer wall, walls or roof of such house, any painted, printed or written announcement or sign of any honest occupation or business, such as 'Bourboise River Inn,' 'Falstaff Beer,' '7. Up' or 'Coca Cola,' whereby any decent person may be deceived or inveigled into such house so ordinarily used as a common assignation house or common bawdyhouse, if you so find, you will find the defendants, Louis Hesselmeyer and Martha Hesselmeyer, guilty as charged in the information, and assess their punishment at imprisonment in the penitentiary for a term of not less than two years or more than ten years.

"A common 'bawdyhouse' is a house of ill fame kept for the resort and commerce for lewd people of both sexes. The term 'assignation house' as used in these instructions means a house resorted to for prostitution."

The first complaint is that the instruction charged in the *disjunctive* that if the defendants exposed or displayed, or caused to be exposed or displayed, or knowingly permitted to be exposed or displayed on the exterior of the building the signs mentioned, the jury might return a verdict of guilty, whereas the information laid the foregoing charge in the *conjunctive*. The authority cited is State v. Brotzer, 245 Mo. 499, 516, 150 S. W. 1078, 1082; and that case is bottomed on State v. Washington, 242 Mo. 401, 409, 146 S. W. 1164, 1166, and State v. Jackson, 242 Mo. 410, 421, 146 S. W. 1166, 1168. The theory of these decisions is that where a statute makes either of several acts criminal; and the information charges in the conjunctive that all of said acts were committed by the accused; and an instruction authorizes the jury in the disjunctive to convict if they find he committed any one or more of said acts; and the jury in response

to said instruction returns a general verdict of guilty as charged—in these circumstances the instruction is prejudicially erroneous and the verdict must be set aside, because it is impossible to tell which act the jury found the defendant committed, it being possible for part of the jurors to find he committed one of the several acts charged, and for another part of the jurors to convict him of another of the acts charged, without a unanimous verdict on any one act.

These decisions are distinguished in State v. Citius, 331 Mo. 605, 613, 56 S. W. (2d) 72, 75. [See, also, State v. Rosegrant, 338 Mo. 1153, 1169, 93 S. W. (2d) 961, 970.] The Citius case points out that where the offense charged is essentially one transaction, the above rule does not apply. The gist of the offense here is displaying the sign of an honest occupation on a common bawdyhouse, whereby decent people may be inveigled thereinto. The statute declares it may be committed by displaying the sign or by causing it to be displayed or by knowingly permitting it to be displayed. If the accused does either of the first two acts he undoubtedly does the third. There can be no question about the fact that a conviction of knowingly permitting the sign to be displayed would bar a prosecution for either of the other two. We think this case comes under the exception stated in the Citius case.

Two other objections urged are, first, that the instruction gave the jury a roving commission to convict the appellants upon a finding that they were the keepers of *a certain* house commonly used as a bawdyhouse and permitted the signs to be displayed therein, without limiting them to Bourboise River Inn mentioned in the information. This objection is without merit. The instruction did require the jury to find the appellants kept the house ''at the place mentioned in the evidence'' and that signs such as those mentioned in evidence were displayed thereon. The evidence referred to the house and signs specified in the information. The other assignment complains of the definition of a common bawdyhouse given in the last paragraph of the instruction. That definition is substantially the one given in State v. Horn, supra, 83 Mo. App. l. c. 50, and is unexceptionable.

But the last assignment of error on this Instruction F seems to us to be well taken. The first paragraph thereof lays down an abstract proposition of law that all persons are equally guilty who act together with a common intent and purpose in the commission of a crime. The instruction, however, does not require the jury to find the appellants did act together in the commission of the crime charged here. On the contrary it declares that if ''the defendants, and each acting alone or together, or either of them'' were the keepers of the house and that it was a common bawdyhouse; and that the *''defendants''* (in the plural) knew the house was so used, and

did display the signs mentioned with the result mentioned; "you will find the defendants (naming both of them) guilty as charged in the information." This undoubtedly authorized a verdict again both defendants upon proof that all or at least a part of the constituent facts applied only to one of them—that is to say, no finding was required that both defendants acted together, or that one represented the other. It is hard to tell just what the instruction does mean. In terms it requires the jury to find only that either or both appellants kept the house, and that it was a common bawdyhouse. From there on the requirement is that "the defendants" knew the house was a common bawdyhouse, and displayed the signs. But the statute authorizes the conviction only of a "keeper or person in charge;" so neither could be convicted without a finding against him to that effect. Furthermore the instruction is open to a construction making the words "each acting alone or together, or either of them" qualify the word "defendants" wherever it is used in the instruction.

The learned Assistant Attorney General says the error in this Instruction F is cured because another instruction told the jury they might acquit either appellant and find the other guilty, or convict both or acquit both. But that does not take the sting out of Instruction F which allows the jury to convict both appellants on evidence incriminating only one of them. We thought, in the beginning, that the error might be harmless since we have found the evidence insufficient to convict the appellant Martha Hesselmeyer, and there is substantial evidence against the appellant Louis Hesselmeyer acting alone. But on reflection we believe the facts make it necessary to remand the cause. Martha Hesselmeyer was the one who engaged in the sexual intercourse. Have we on this court the right to say what all the jurors thought, and to brush aside the possibility that under this instruction some of the jurors may have convicted Louis Hesselmeyer because of the character of evidence against his wife—even though we find it insufficient? We cannot substitute our judgment for that of the jury, acting under proper instructions.

For the error in Instruction F the judgment is reversed and the cause remanded. All concur.